[No. 39748-6-I. Division One. September 28, 1998.]

L. DAVID TYNER III, *Respondent*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Appellant.*

---

[21]RCW 2.06.040.

*Christine O. Gregoire, Attorney General,* and *Rene D. Tomisser, Assistant,* for appellant.

*Richard L. Martens* of *Johnson & Martens, P.S.*; and *Jeffrey G. Poole* of *Jeffrey G. Poole, P.C.*, for respondent.

BECKER, J. — Suspected of sexually abusing his children, David Tyner was subject to no-contact orders for several months. After the restriction was lifted, he successfully sued the State on a theory of negligent investigation by Child Protective Services. We reverse the judgment entered on the jury verdict, finding insufficient evidence to support a finding that the CPS investigation was a legal cause of the court decisions ordering no contact.

Tyner also sued the children's therapist, who obtained a dismissal on the basis of absolute immunity. Although we hold the therapist was not immune from suit, the malpractice claim against her was properly dismissed for lack of duty.

## FACTS

On Monday, January 11, 1993, Debra Tyner arrived home with her daughter, age six, and her son, age four. Seeing her husband's car in front of the house, Debra said, "Oh good, Dad's home already." According to Debra, her son said "Good," but then after a pause continued, "But sometimes he's mean to me." When she asked him what he meant, he complained that sometimes his dad pulled his penis too hard and poked him in the bottom with his finger. In the discussion that followed, Debra's daughter said

her father knew he should not touch her because when he did, she would call for her mother. These remarks caused Debra to become concerned that her husband, plaintiff David Tyner, had been sexually abusing both children.

When David Tyner learned of Debra's concern, he denied any misconduct. Summoned by their parents, the children denied that their father had touched their private parts. That evening, Debra and David met with their former marriage counselor. With his encouragement, the next day, January 12, Debra reported her concerns to the Harborview Sexual Assault Center. Harborview informed Child Protective Services (CPS), and caseworker Bill Mix received the case.

Mix interviewed the children at their school. The children denied that their father had touched them, said it was not something their mother should talk about, and put their hands over their ears and refused to talk further. Mix felt the children were "overly scared to talk," and was convinced they had said at least some of the things their mother had reported. Mix next interviewed David Tyner. David denied any inappropriate touching.

The following day, January 13, Debra took the children to their pediatrician for an examination. The examination found no physical evidence of abuse, but the pediatrician was concerned due to the history related by Debra. In talking with the pediatrician, the daughter confirmed that her brother had made the reported comment about his penis being pulled too hard.

Within the next two days, Debra hired a lawyer and prepared a petition for an order of protection.[1] The lawyer telephoned caseworker Mix on January 15 and asked him to write a letter to be used in support of the petition. Mix provided a declaration dated January 15, summarizing what the two parents and two children had told him and stating his intention to file a dependency petition. He said that pending the completion of his investigation, his rec-

[1]*See* RCW 26.50.030.

ommendation to the court would be that David move to another residence, and that the children for the time being have no contact with their father.[2] The superior court so ordered that same day in response to Debra's ex parte petition, and David moved out.

On January 26, Mix filed a dependency petition.[3] On January 29, the juvenile court held a shelter care hearing.[4] Present at the shelter care hearing were Debra and David Tyner, their respective attorneys, Bill Mix, and an assistant attorney general. After the hearing, the court placed the children with Debra under the supervision of the State. The court made a finding that releasing the children to David "would present a serious threat of substantial harm" to the children. The court also ordered that Debra was not to talk with the children about the allegations. David was to undergo a sexual deviancy evaluation and have no contact with his children. A sexual assault evaluation of the children was to proceed promptly at the Sexual Assault Center at Harborview.

On February 10, Debra filed a petition for dissolution of marriage. Beginning on February 16, an evaluator at the Sexual Assault Center began working with the Tyner children.

On March 2, the juvenile court held a second shelter care hearing,[5] and issued another order continuing its placement of the children with Debra. The protection order against David was rescinded, but contact between David and the children was prohibited unless agreed to by the children's therapist, David's therapist, and the State. All

---

[2]See RCW 26.44.063.

[3]See chapter 13.34 RCW.

[4]The purpose of a shelter care hearing is to decide whether a child who is alleged to be dependent should be placed in the State's custody. At the hearing, the State makes a recommendation to the court as to the need for shelter care. RCW 13.34.060(7). The court must release a child to parental custody unless it makes a finding of reasonable cause not to do so. RCW 13.34.060(8).

[5]RCW 13.34.060(10) provides: "No child may be detained for longer than thirty days without an order, signed by the judge, authorizing continued shelter care."

evaluations were to be completed, including psychological evaluations of the parents.

David's sexual deviancy evaluation was completed on April 2. His evaluator reported that he had no reason to suspect David abused his children, and no reason to recommend against visitation or that visitation be supervised.

The Sexual Assault Center evaluation of the children was completed on April 23. The evaluator, after conducting five interview sessions with each child as well as interviews with the parents, described the children as anxious and guarded. She was unable to say with certainty whether or not Mr. Tyner had sexually abused his children but had concerns about the children's well-being because of what she described as the family's poorly defined sexual boundaries and the parents' history of conflicts around sexuality. She recommended that the children not be questioned further about the alleged abuse, that contact between David and the children continue to be supervised, and that further therapy focus on conflicts within the family rather than sexual abuse.

On April 27, the juvenile court continued until June 28 the dependency fact-finding that had been scheduled for May 3. David Tyner opposed the continuance, but the court found it necessary because the children's evaluator would be out of the country until the end of May, and the parents had not completed their psychological evaluations.

David Tyner began to have supervised visitations with the children one hour each week. Meanwhile, Child Protective Services caseworker Toni Sebastian referred Debra to therapist Inda Drake. Both Debra and David met with Drake, and agreed to allow her to provide therapy to the children. On June 23 each parent entered into a "voluntary services contract," agreeing that the children would continue in therapy with Drake, and Drake would decide whether David's visitation should be restricted or liberalized.

On June 28, the juvenile court dismissed the dependency actions on the State's motion. The order recited that the

family court had granted Debra temporary custody of the children, both Debra and David had cooperated with court-ordered services and agreed to a future course of conduct, and all parties agreed the juvenile court structure was unnecessary and dismissal was in the best interests of the children. CPS had no further involvement with the Tyner family.

David became dissatisfied with Inda Drake's performance as a therapist. He complained that she had failed to inform him of progress with the children, and that she was questioning the children about the allegations of sexual abuse notwithstanding the recommendations against continued exploration of that topic. He tried unsuccessfully to have the children switched to a different therapist.

The Tyners' divorce became final in October, 1993. After further litigation about the parenting plan, the court eventually granted joint custody to Debra and David, and lifted all restrictions on David's contact with the children.

On February 22, 1995, David Tyner sued CPS, Inda Drake, the former marriage counselor, and the pediatrician on a variety of theories. Before trial, the complaint was pared down to an action against CPS for negligent investigation. On this claim, the jury awarded $201,500 to David Tyner. The State appeals from the judgment entered on the verdict. David cross-appeals from the court's summary judgment order dismissing his suit against Drake.

## DUTY TO INVESTIGATE

▇▇ The State has a duty to use care in investigating allegations that could lead to dependency or termination of parental rights.[6] The State contends that in cases where a child's parent is being investigated, the State's duty is owed

---

[6]*Lesley v. Department of Soc. & Health Servs.*, 83 Wn. App. 263, 273, 921 P.2d 1066 (1996), *review denied*, 131 Wn.2d 1026 (1997); *Yonker v. Department of Soc. & Health Servs.*, 85 Wn. App. 71, 930 P.2d 958, *review denied*, 132 Wn.2d 1010 (1997) (a cause of action arises not only when the State performs a negligent investigation, but also when the State negligently fails to initiate an investigation); *Whaley v. Department of Soc. & Health Servs.*, 90 Wn. App. 658, 956 P.2d

to the child only, not the parent. On that theory, the State assigns error to the denial of the State's motion to dismiss and to the rejection of the State's proposed jury instructions.

The scope of any duty is bounded by the foreseeable range of danger.[7] As the Legislature has recognized, a parent, custodian, or guardian of a child is within the class of persons who are foreseeably harmed by a negligent investigation into allegations of child abuse:

> The Washington state legislature finds and declares: The bond between a child and his or her parent, custodian, or guardian is of paramount importance, and *any intervention into the life of a child is also an intervention into the life of the parent*, custodian, or guardian[.][8]

To unduly prolong the child's dependence on the State in place of the parent is dangerous to the parent-child bond, and may cause needless anguish to parent as well as child.

The State points to legislative declarations mandating that a child's right to safety and nurture should prevail over any conflicting rights of a parent.[9] The State contends that if its investigators must be mindful of potential damage to parent as well as child, the State's primary mission of protecting children will be undermined and conflicted.

Certainly, the primacy of the welfare of children must be the State's guide in situations where the information immediately available neither confirms nor disproves a report of a child's abuse by a parent. But because further investigation may show that it is unnecessary to continue a particular form of intervention dictated by an initial report, the State owes both child and parent a duty to investigate promptly and thoroughly.

---

1100 (1998) (DSHS and law enforcement agencies, not reporters, have the duty to investigate).

[7] *Id.* at 674.

[8] RCW 26.44.010 (emphasis added).

[9] *See, e.g.*, RCW 13.34.020 ("When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail.").

Accordingly, we hold the court did not err in denying the State's motion to dismiss, refusing its proposed instructions pertaining to duty, and instructing the jury in the language of RCW 26.44.010, quoted above.

## IMMUNITY

■ The State assigns error to the trial court's refusal to dismiss on the ground of immunity. We have already held that the State is not protected by absolute immunity as a participant in the judicial process for its acts or omissions occurring after the filing of a dependency petition.[10] The State also claims the immunity afforded to expert witnesses by the Supreme Court's decision in *Bruce v. Byrne-Stevens & Associates*.[11]

■ In *Bruce,* the expert witnesses were engineers who had been retained to give an opinion supporting a suit for damage to property. They were sued themselves when the compensation that was awarded based on their estimate turned out to be inadequate to restore the property. The court held that expert witnesses have immunity not only for their testimony in court but also for the investigation and gathering of information on which their testimony rests.

Unlike the engineers, the CPS investigators did not act because a potential litigant had retained them in anticipation of the need for expert testimony at judicial proceedings. They conducted their investigation because it was their statutory duty to do so. Their duty to investigate exists independently of the possibility that they may eventually testify about the results of their investigation. David Tyner is suing the State for negligent investigation, not for negligence in providing expert testimony.[12] We conclude the

---

[10]*Gilliam v. Department of Soc. & Health Servs.*, 89 Wn. App. 569, 950 P.2d 20 (1998) (filed after the parties in this case submitted their briefing).

[11]*Bruce v. Byrne-Stevens & Associates*, 113 Wn.2d 123, 776 P.2d 666 (1989).

[12]*See id*. at 134-35.

trial court correctly denied the State the shield of expert witness immunity.

## PROXIMATE CAUSE

The State next contends its motion to dismiss at the end of the case should have been granted on the basis that no act or omission of the caseworkers was a proximate cause of David Tyner's damages. His damages, according to the State, were caused solely by the court orders restricting his contact with the children.

■■ In reviewing the denial of the State's motion to dismiss, we apply the same standard as the trial court.[13] The nonmoving party's evidence, together with all reasonable inferences that may be drawn from it, must be accepted as true.[14]

■■ To establish cause in fact in a negligence suit, there must be substantial evidence that some act or omission of the defendant produced injury to the plaintiff in a direct, unbroken sequence under circumstances where the injury would not have occurred but for the defendant's act or omission.[15] This factual or "but for" aspect of proximate cause is generally a matter for the jury, unless only one reasonable conclusion is possible.[16]

In *Waller v. State*,[17] this court reinstated a claim for negligent investigation brought by a father. The mother had persuaded the court to eliminate the father's visitation rights pending trial of her petition to modify, relying in part on testimony by a CPS caseworker expressing the opinion that the father had sexually abused the children.[18]

---

[13]*Holmes v. Wallace*, 84 Wn. App. 156, 161, 926 P.2d 339 (1996).

[14]*Id.*

[15]*See Hartley v. State*, 103 Wn.2d 768, 778, 698 P.2d 77 (1985).

[16]*Id.*

[17]*Waller v. State*, 64 Wn. App. 318, 824 P.2d 1225 (1992).

[18]*Id.* at 324.

In the father's later suit against the State, there was evidence that the caseworker's determination was based on a negligent investigation. The use of the caseworker's testimony to influence the court's decisions could, we held, raise an issue of fact as to the proximate cause element of the claim.[19]

Taking all inferences in favor of David Tyner, we similarly conclude there was sufficient evidence to support the factual aspect of proximate cause. But for the CPS investigation and the recommendation by Mix to have David removed from the home, it is possible the courts below would not have issued or extended the orders restricting David Tyner's contact with his children.

Legal causation, an element of proximate cause distinct from cause in fact, involves a determination of whether liability should attach as a matter of law given the existence of cause in fact.[20] Although the existence of legal causation is intertwined with the existence of a duty, "legal causation should not be assumed to exist every time a duty of care has been established."[21] A determination of legal cause rests on matters of policy and common sense as to how far a defendant's responsibility for the consequences of its actions should extend.[22]

The State contends it is not wise public policy to hold caseworkers accountable for the decisions made by courts. Responding, David relies on *Lesley v. Department of Social & Health Services*,[23] in which this court permitted plaintiffs to go to trial on a claim that a negligent investigation conducted by CPS caused an unjustified six-day removal of a child from her parents. *Lesley*, however, does not control

---

[19]*Id.* at 333.

[20]*Hartley v. State*, 103 Wn.2d at 779.

[21]*Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 480, 951 P.2d 749 (1998).

[22]*Taggart v. State*, 118 Wn.2d 195, 226, 822 P.2d 243 (1992).

[23]*Lesley v. Department of Soc. & Health Servs.*, 83 Wn. App. 263, 921 P.2d 1066 (1996), *review denied*, 131 Wn.2d 1026 (1997).

because unlike here, the State did not raise lack of proximate cause as a defense. And in *Lesley* the caseworker separated the parent and child before there had been any court proceedings.

 The issue here is whether a caseworker's negligent investigation can be a legal cause of damage resulting from separation of parent and child if a court orders the separation. Courts are absolutely immune from liability even for willful misconduct.[24] Thus, a parent aggrieved by a court's no-contact order may not recover damages from the court, even with proof that the order was unjustified. The State's liability for negligent investigation was not created to fill the gap left by judicial immunity.

In some circumstances, the conduct of CPS caseworkers can be a legal cause of separation brought about by a court order. As explained in *Babcock v. State*,[25] caseworkers can be held accountable for influencing a court in situations where the caseworker "controls the flow of information to the court":[26]

> Similarly, a caseworker cannot escape liability for negligent investigation because the juvenile court commissioner relies on the caseworker's recommendation to allow a caseworker's placement decision to stand. In the absence of a preplacement adversary hearing in which a predisposition study is entered into evidence, the caseworker controls the flow of information to the court.

The *Babcock* court relied on *Bender v. City of Seattle*,[27] a decision holding that a suit for false arrest may go forward even though the officer has first obtained a warrant for the arrest, because the officer is in a position to control the

---

[24]*See Babcock v. State*, 116 Wn.2d 596, 606, 809 P.2d 143 (1991).

[25]*Id.*

[26]*Id.* at 608.

[27]*Bender v. City of Seattle*, 99 Wn.2d 582, 664 P.2d 492 (1983).

flow of information to the magistrate upon which probable cause determinations are made."[28]

Federal courts similarly recognize that a judge's intervening decision to issue an arrest warrant does not break the causal chain between the officer's decision to apply for it and the improvident arrest.[29] But the causal link does not extend to damages beyond those caused by the initial false arrest.[30] When substantial evidence of the arrestee's guilt later comes to light, leading to conviction and sentence, holding the police liable for these later proceedings "makes little sense" because it "trivializes" the role of independent decision makers:

> To hold that the decisions of the prosecutor, juries and judge do not break the chain of proximate causation trivializes the importance of these post-arrest decisions, which do not merely pass on the correctness of the seizure or arrest by police but which, based on all the information then available to these court officials, determine the likelihood that a potential defendant is guilty of violating the law.[31]

A line must be similarly drawn between court-ordered separations for which the court alone is responsible, and court-ordered separations for which the State's investigators may be held responsible. At some point, as a matter of policy and common sense, the independent exercise of judicial power breaks the chain of legal causation. To hold that legal cause can be established by expert testimony of the type given in this case—that courts "always follow" the recommendations of social workers in dependency

---

[28]*Id.* at 592. *See also Bankruptcy Estate of Hansen v. City of Kent*, 81 Wn. App. 270, 289-92, 914 P.2d 127 (1996) (judge's considered but erroneous determination of probable cause does not necessarily break chain of causation between police request for search warrant and unreasonable search and seizure).

[29]*Malley v. Briggs*, 475 U.S. 335, 345-46, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986).

[30]*See Barts v. Joyner*, 865 F.2d 1187 (11th Cir. 1989).

[31]*Id.* at 1196-97.

proceedings[32]—would be to trivialize the independent role of the judge. Guided by *Babcock* and *Bender,* we hold that full responsibility for a court order restricting a parent-child relationship belongs to the court once the State has placed all the material information reasonably at its disposal before the court and the other parties to the litigation. It makes little sense to hold that CPS is the cause of a court's decision to separate parent and child unless the information supplied by CPS to the court is materially misleading or incomplete.

The State argues that its exposure to liability should end as soon as its investigation is put under the supervision of a judge in any adversarial court proceeding as to which the aggrieved parent has notice and an opportunity to defend. But to terminate the State's liability at a fixed point in the judicial process would create an undesirable incentive for the State to convert every investigation into a judicial proceeding. The pivotal consideration is not the involvement of the court per se, but whether the State has placed before the court all the information material to the decision the court must make. Concealment of information or negligent failure to discover material information may subject the State to liability even after adversarial proceedings have begun.

Accordingly, we examine the plaintiff's evidence in this case to determine whether the court that restricted David Tyner's contact with his children relied on materially misleading or incomplete information placed before them by the CPS caseworkers. The plaintiff's case relied on expert witnesses with experience in CPS investigations. According to these witnesses, Mix's investigation was negligent in that he failed to contact "collateral sources," persons suggested by David as being familiar with the children. If he had interviewed them, these neighbors and family members would have told Mix they had never seen any signs of abuse. The experts testified that if the CPS caseworkers had been aware of the lack of support among

[32]1 RP 148.

collateral sources for Debra's allegations, they would not have allowed court supervision to last so long. And Mix would not have allowed Debra to use his declaration to support her petition for an order of protection just a few days after her initial contact with CPS.

No doubt there are cases in which collateral sources contribute material information, without which both the investigator and the court have a distorted view of the child's situation. But the expert witnesses' testimony does not explain how the information from relatives and neighbors was material to the court's perception of this case. The court confronted a difficult problem: what to do about uncorroborated and possibly misleading indications of serious child abuse. The seriousness of the alleged abuse would remain no matter how many people testified that they had not seen it and thought it unlikely. The court to which Debra submitted her motion for a no-contact order decided to deal with the problem by separating the children from their father. The dependency court decided to maintain the no-contact order pending completion of a series of professional evaluations. These may or may not have been the best decisions under the circumstances, but there is no reason to believe the courts would have relaxed the no-contact orders sooner if the caseworkers had informed the court that many people who knew the children did not believe they had been abused and did not believe David Tyner capable of abusing them.

One of the expert witnesses placed considerable emphasis on the fact that Mix, upon completion of his investigative role in the case in early February, checked off a box in the case record to indicate that the allegations were "unfounded," as distinguished from the options "founded" or "inconclusive." There was testimony that Mix breached the standard of care by failing to inform David or the court of this determination. One available inference is that Mix maintained the dependency action even after coming to the conclusion that the State would not be able to prove abuse or neglect.

But the term "unfounded" is an opinion or legal conclusion, not a representation of fact. The information on which Mix based his opinion was fully available to the court. At that point, the court was able to decide for itself whether the report of child abuse was founded or unfounded. The investigator's opinion was not a legal cause of the court's decision.

David Tyner asserts that for several months, CPS did not allow him any contact of any kind with his children. The record does not support his assertion. The court, and in this case only the court, was responsible for denying him permission to contact them. We conclude the evidence was insufficient to support a finding that any negligence of the caseworkers was a legal cause of the no-contact orders that separated David Tyner from his children. The judgment against the State must therefore be reversed.

## IMMUNITY OF COURT APPOINTED THERAPIST

David also sued Inda Drake, alleging malpractice and numerous other causes of action. Drake is the therapist who began working with the Tyner children in June, 1993. Drake obtained an order of summary judgment dismissing David's claims against her on the basis of absolute immunity. David cross-appeals from that order.

In evaluating Drake's claim of absolute immunity, our inquiry must focus on the function served by her conduct on which the assertion of liability rests. Absolute immunity is accorded only to those functions that are an integral part of a judicial proceeding.[33] Functions integral to a judicial proceeding include judging, advocating, prosecuting, fact finding, and testifying.[34]

For purposes of summary judgment, we accept David's representation that his claims against Drake are

---

[33]*Taggart v. State*, 118 Wn.2d at 213.

[34]*Gilliam v. Department of Soc. & Health Servs.*, 89 Wn. App. 569, 583, 950 P.2d 20 (1998).

based entirely on her conduct as a provider of therapy for the Tyner children under a written services contract, not upon her testimony as a witness and not upon conduct immunized by RCW 26.44.060. The provision of therapy is not a function that is integral to a judicial proceeding, and is therefore not ordinarily entitled to absolute immunity.

Inda Drake contends, however, that the therapy she provided is entitled to immunity under *Bruce v. Byrne-Stevens & Assocs.*[35] because it was done in preparation for testifying in court as an expert witness. Taking all inferences from the record in favor of the nonmoving party, as we must in reviewing an order of summary judgment,[36] we cannot characterize Drake as an expert witness as a matter of law. No one retained her to prepare testimony. Her role was to provide therapy directly to the children, in fulfillment of the recommendation of the evaluator from the Harborview Sexual Assault Center. Drake's participation in the litigation over the parenting plan was incidental to her role as a therapist.

Drake also claims that she is absolutely immune because the court appointed her to provide therapy. She argues that she acted as an "arm of the court," as the phrase is used in *Bader v. State.*[37] *Bader* affords immunity to court-appointed professionals whose function it is to provide the court with information and recommendations on such matters as the competency of a criminal defendant or the release of a person designated as insane. Again with all inferences taken against Drake, the record does not necessarily support a conclusion that she was appointed to make recommendations on how the court should decide upcoming issues in litigation. The court's order stating that "Inda Drake will provide therapy for the children" did not require Drake to report back to the court. A jury could reasonably conclude that the court orders mentioning Drake simply

---

[35]*Bruce v. Byrne-Stevens & Associates*, 113 Wn.2d 123, 776 P.2d 666 (1989).

[36]*Lamon v. McDonnell Douglas Corp.*, 91 Wn.2d 345, 349, 588 P.2d 1346 (1979).

[37]*Bader v. State*, 43 Wn. App. 223, 226, 716 P.2d 925 (1986).

endorsed the Tyners' agreement to select Drake as a therapist and imposed responsibility on them for payment of Drake's fees.

The summary judgment order granting dismissal of all claims on the basis of absolute immunity is reversed. To the extent that David's theories of liability against Inda Drake arise from her conduct in providing therapy to the Tyner children pursuant to a written services contract, absolute immunity does not protect her.

## THERAPIST'S DUTY OF CARE TO THIRD PARTIES

The court dismissed David Tyner's action for malpractice against Inda Drake not only on the basis of absolute immunity, but also because David was not Drake's patient. This decision was sound. David has offered no authority for the proposition that a therapist owes a duty of care to a nonpatient. As a rule, the focus of concern of medical care practitioners should be upon the patient, without the practitioner having to be concerned about possible effects on third parties.[38]

David's argument that he himself was a patient of Drake is without merit. Drake was asked to provide therapy only for the children, and she in fact provided therapy only for the children. Accordingly, the summary judgment dismissal of the malpractice claim is affirmed on the basis that Drake owed David no duty of care.

## CONCLUSION

Child Protective Services does owe to parents who are alleged to have abused their children a duty to investigate the allegation with due care. The State is not immune from liability for the negligent investigation of such allegations. The negligence of the State's investigators can be a legal

---

[38]*Zamstein v. Marvasti*, 240 Conn. 549, 692 A.2d 781, 787-88 (1997). *Cf. Althaus v. Cohen*, 710 A.2d 1147, 1156 (Pa. Super. 1998) (duty to parents may arise when psychiatrist who treats child becomes "deeply enmeshed" in legal proceedings against the parents).

cause of a court's order separating a child from a parent only if it results in the court being supplied with information that is materially misleading or incomplete.

When a court orders that children receive therapy, the mental health practitioner who is selected to provide does not necessarily possess absolute immunity from liability as a witness or as an arm of the court. But a therapist's duty of care in such cases is ordinarily owed only to the children, and not to their parents or other third parties.

The judgment in favor of David Tyner against the State is reversed. The order of summary judgment dismissing David's malpractice claim against Inda Drake is affirmed. The order dismissing all other claims asserted by Tyner against Drake is reversed.

WEBSTER and BAKER, JJ., concur.

Review granted 137 Wn.2d 1020 (1999).