[No. 42387-8-I.    Division One.    December 13, 1999.]

KATHY BELTRAN, *Individually and as Guardian, Appellant*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, ET AL., *Respondents*.

*David P. Moody* and *Darrell L. Cochran* of *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim*, for appellant.

*Christine O. Gregoire, Attorney General*, and *Rene David Tomisser, Assistant*, for respondents.

APPELWICK, J. — Kathy Beltran's three young children were placed in a foster home where they were sexually assaulted by the foster mother's teenage son. Beltran sued the State of Washington, the Department of Social and

Health Services (DSHS), Child Protective Services (CPS), and Janet Engle, the caseworker who licensed the foster home, for negligence and civil rights violations under 42 U.S.C. § 1983. The trial court granted the defendants' motion for summary judgment dismissing all claims.

On appeal, Beltran contends that the trial court erred in granting summary judgment because there were several genuine issues of material fact regarding whether the respondent, State and caseworker, proximately caused the children to be injured due to negligent screening and licensing of the foster home. In light of the trial court's summary judgment in favor of Gloria St. Jacques on the essential issue of negligent supervision, an order which was not appealed, Beltran has failed to establish legal causation. We therefore affirm summary judgment in favor of the remaining defendants.

Beltran also assigns error to the trial court's order denying Beltran's motion to compel discovery of caseworkers' personnel files, and the court's order to seal and strike from consideration information regarding the foster mother's arrest history. Finding no abuse of discretion, we affirm those orders of the trial court.

## FACTS

In May of 1994, the State of Washington, through its agency, the Department of Social and Health Services took control and custody of the minor-appellants in this case, C.S., aged 7, E.S., aged 5, and Z.B., aged 3. The State placed these three children in the foster home operated by Gloria St. Jacques and her sister, Judy Soriano. The children were kept at this foster home until August 22, 1994, when they were returned to their mother, Kathy Beltran.

In October of 1994, investigators from the Washington Child Protective Services determined that all three children had been sexually assaulted by Gloria St. Jacques' thirteen-year-old son Christian while they were in foster

care. Christian St. Jacques was found guilty of first degree child molestation for violations against E.S. and Z.B., but not guilty of molesting C.S.

On May 13, 1996, Beltran sued the State of Washington, the Department of Social and Health Services, Child Protective Services, and Janet Engle, the caseworker who licensed the foster home, for negligence and civil rights violations under 42 U.S.C. § 1983. Beltran alleged that the respondents (defendants below) failed to comply with the laws that regulate licensing and supervision of foster homes.

Specifically, Beltran argued, first, that the licensure of the St. Jacques' home was illegal because the respondents failed to conduct a mandatory investigation prior to issuing the license. Second, Beltran contended that the foster care license was issued negligently because (1) St. Jacques also provided care to a paraplegic woman under an elder care license and St. Jacques held a day care license, when such multiple licensure is generally prohibited; and (2) the foster care license permitted placement of only three foster children, yet a fourth foster child was placed at the St. Jacques home. Third, foster parents are required to have financial means apart from foster care income, yet neither St. Jacques nor Soriano had outside income. Fourth, the license was issued jointly to St. Jacques and Soriano, yet there is little, if any, evidence that Soriano provided care to the foster children or the paraplegic woman. Fifth, the caseworker was aware that St. Jacques falsely claimed that she had not previously applied for a foster care license on her application for a foster care license. Finally, Beltran contended that the respondents' investigation of the St. Jacques home was negligent as shown by the respondents' failure to discover (1) that Gloria St. Jacques' adult daughter did not move out of the home in order to make room for the children as promised; and (2) that Gloria St. Jacques impermissibly allowed her ex-husband to have frequent, unsupervised access to the foster children.

Initially, the trial court denied Beltran's motion to compel discovery of caseworkers' personnel files. The trial court also ordered that the foster mother's arrest history be sealed and stricken from consideration. Finally, the trial court granted the defendants' motion for summary judgment dismissing all claims.

On appeal, Beltran contends that there are several genuine issues of material fact regarding her claim that the State, through its caseworker, proximately caused the children to be injured due to negligent screening, licensing, and monitoring of the foster home. Beltran also assigns error to the trial court's denial of her motion to compel discovery, and the trial court order to seal and strike from consideration Gloria St. Jacques' arrest history.

## ANALYSIS

### Standard of Review

■ Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." CR 56(c). In reviewing an order of summary judgment, this court engages in the same inquiry as the trial court. *Our Lady of Lourdes Hosp. v. Franklin County*, 120 Wn.2d 439, 451, 842 P.2d 956 (1993). All facts and reasonable inferences from the facts are considered in the light most favorable to the nonmoving party. *Mountain Park Homeowners Ass'n, Inc. v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994). Questions of law are reviewed de novo. *Id.* at 337.

To establish a tort claim for negligence, Beltran must demonstrate (1) the existence of a duty owed to her; (2) a breach of that duty; and (3) an injury proximately caused by that breach. *Ruff v. King County*, 125 Wn.2d 697, 704, 887 P.2d 886 (1995).

Beltran contends that summary judgment was improper

because a jury could reasonably find that the defendants proximately caused her children's injuries by their failure to comply with the laws that regulate licensing and supervision of foster homes. Beltran specifically argues that but for the respondents' failures to abide by these laws, her children would not have been living in the St. Jacques' home and, thus, would not have been sexually assaulted by Christian St. Jacques. Only the proximate cause element of the claim is at issue in this appeal.

■ "A cause is 'proximate' only if it is both a cause in fact and a legal cause." *Gall v. McDonald Indus.*, 84 Wn. App. 194, 207, 926 P.2d 934 (1996), *review denied*, 131 Wn.2d 1013 (1997).

## Cause in Fact

■ To establish cause in fact in a negligence suit, there must be substantial evidence that some act or omission of the defendant produced injury to the plaintiff in a direct, unbroken sequence under circumstances where the injury would not have occurred but for the defendant's act or omission. *Tyner v. Department of Soc. & Health Servs.*, 92 Wn. App. 504, 514, 963 P.2d 215 (1998) (citing *Hartley v. State*, 103 Wn.2d 768, 778, 698 P.2d 77 (1985)). This factual aspect of proximate cause is generally a matter for the jury, unless only one reasonable conclusion is possible. *Hartley*, 103 Wn.2d at 778.

There are facts in the record that strongly suggest that the foster care license of the St. Jacques home was granted in violation of the law. Under RCW 74.15.040, foster homes shall be inspected prior to licensure to insure that they meet the requirements for foster homes as adopted pursuant to chapter 74.15 RCW and RCW 74.13.031. *See also* Division of Child and Family Services (DCFS) Policy 06.15A. However, DSHS granted St. Jacques' foster care license on January 12, 1994, six days before conducting the legally mandated investigation into the background of the prospective foster care providers. Also, WAC 388-73--036(2)(f) requires that foster parents have financial means

and income other than the income from foster care. However, caseworker Engle knew that neither Gloria St. Jacques nor Judy Soriano had jobs or other income. And though the license was issued jointly to St. Jacques and Judy Soriano, there is substantial evidence that Judy Soriano provided little, if any, care to the four children or the elderly paraplegic woman.

Furthermore, WAC 388-73-028 provides that the State shall not issue a license to an applicant for both day care and foster care, nor for both children and adults in the same facility. It further provides that the State may authorize exceptions only if it is clearly evident that care for a person in one category will not interfere with the safety of those in other categories. And the license must specify a maximum number of individuals who may be cared for, a number that is strictly observed. Despite this law, caseworker Engle ignored the fact that St. Jacques would be providing care under three separate care licenses: elder care, day care and foster care. The State granted a waiver for the St. Jacques home to provide day care and foster care. However, there is no evidence that the State considered whether any conflicts would arise from the fact that a 78-year-old paraplegic woman was living and being cared for in the St. Jacques home at the time of the licensing. The record further shows that a fourth foster child was placed in the St. Jacques home, even though the license was for only three children.

Furthermore, WAC 388-73-036(2) requires a licensor to deny or revoke a foster care license where an applicant has obtained or attempted to obtain a foster care license by fraudulent means of misrepresentation, either by making materially false statements on the application or by making material omissions which would influence the appraisal of the applicant's suitability.

Nonetheless, Engle did not deny St. Jacques' application or even investigate further upon learning of St. Jacques' admitted misrepresentations on her application regarding prior foster care. On the application, St. Jacques claimed

that she had not previously applied for a foster care license. But, during the home interview, Engle learned that St. Jacques had provided foster care in Colorado approximately ten years earlier. St. Jacques told Engle that she had to stop providing foster care in Colorado because her son Christian "resented the time it took away from the parents." Engle concedes that she never asked any questions about St. Jacques' failure to disclose her prior foster care experience on her application.

Beltran also points to the following facts to show misrepresentations by St. Jacques and negligent investigation by the State. First, St. Jacques told Engle that her adult daughter was moving out to make physical room for the foster children, yet that did not happen. Second, St. Jacques failed to disclose that her ex-husband, John St. Jacques, would frequently have unsupervised contact with the children.

There is evidence in the record indicating that the respondents would not have granted Gloria St. Jacques a foster care license had they been aware of John St. Jacques' presence in the foster home. Specifically, in a March 30, 1995, letter to Gloria St. Jacques and Judy Soriano revoking their foster care and day care licenses, DSHS cited the fact that John St. Jacques was allowed frequent, unsupervised access to the foster home as one of the grounds for revocation. In the same letter, DSHS referred to an interview with Gloria in which she acknowledged an incident between John and their teenage daughter in which John placed his hand on his daughter's breast, causing the daughter to lock herself in the bathroom and become very upset. In the interview, Gloria dismissed the incident as an innocent mistake.

In the March 30 letter, DSHS stated the above incidents are in violation of WAC 388-73-030. That section provides, inter alia,

**General qualifications of licensee, adoptive applicants, and persons on the premises.**

(1) The adoptive applicant, licensee, staff, and other person on the premises shall be a person of good character.

(2) The licensee . . . shall demonstrate that the licensee . . . and other person having access to a person under care have the understanding, ability, physical health, emotional stability, and personality suited to meet the physical, mental, emotional, and social needs of the person under care.

The revocation letter from DSHS also refers to violations of WAC 388-155-440, which provides:

**Limitations to persons on premises**

(1) During home operating hours or while the child is in care, only the child's parent, the licensee, an employee, the licensee's family member, a volunteer, or an authorized representative of a governmental agency shall have unsupervised or regular access to the child in care.

Finally, Beltran asserts that the State's failure to discover the above regulatory violations ran afoul of RCW 74.13.031. That statute provides that DSHS "shall have the duty to provide child welfare services . . . and shall, . . . [m]onitor out-of-home placements, on a timely and routine basis, to assure the safety, well-being, and quality of care being provided . . . ."[1]

Conversely, the respondents argue that none of the facts above constitute genuine issues of material fact precluding summary judgment. In our review of the summary judgment order, we will draw every inference from these facts in favor of Beltran, as the nonmoving party.

## Legal Causation

Legal causation is an element of proximate cause that is distinct from cause in fact. Legal causation involves a determination of whether liability should attach as a matter of law given the existence of cause in fact. *Tyner v. Department of Soc. & Health Servs.*, 92 Wn. App. 504, 515,

---

[1]Beltran asserts additional facts in her briefs on appeal, which could not be verified by the record provided. We also note that Beltran improperly cites to trial court briefs in support of her factual assertions, rather than to independent documents in the record.

963 P.2d 215 (1998). "The focus in the legal causation analysis is whether, as a matter of policy, the connection between the ultimate result and the act of the defendant is too remote or insubstantial to impose liability." *Schooley v. Pinch's Deli Mkt.*, 134 Wn.2d 468, 478, 951 P.2d 749 (1998). This determination depends upon "mixed considerations of logic, common sense, justice, policy, and precedent." *Schooley*, 134 Wn.2d at 479 (citation omitted); *Tyner*, 92 Wn. App. at 515 (citing *Taggart v. State*, 118 Wn.2d 195, 226, 822 P.2d 243 (1992)).

Beltran's complaint against Gloria St. Jacques alleged the breach of a duty to protect the foster children in her care from the intentional, sexual torts of her son. St. Jacques' motion for summary judgment asserted that under *Barrett v. Pacheco*, 62 Wn. App. 717, 815 P.2d 834 (1991), and *Carey v. Reeve*, 56 Wn. App. 18, 781 P.2d 904 (1989), she as a parent could be liable only for the intentional torts of her son if she knew or should have known of the dangerous proclivities of her son, and then failed to take reasonable steps to control those proclivities (i.e., by supervising her son and his interaction with the foster children). The trial court agreed with St. Jacques. That order was not appealed and is now the law of the case. St. Jacques had no notice of her son's dangerous proclivities nor should she have known about them. Thus, as a matter of law, she did not negligently fail to supervise her son's interactions with the foster children.

On appeal, Beltran asks us to find that the State knew or should have known of a dangerous propensity in Christian. But the factual basis for such a finding would rest on either the same facts that resulted in summary judgment in favor of Gloria St. Jacques, or on a subset of those facts. Beltran asserts the State failed to monitor and supervise Gloria St. Jacques, and her son, failed to revoke her foster care license in a timely manner, or should have known this earlier and never placed the children with Gloria. The underlying premise of Beltran's argument is that the presence of the children in the St. Jacques home without ade-

quate supervision exposed them to harm. But, the "lack of adequate supervision" has been rejected in the unappealed summary judgment. The allegations of failure to monitor or supervise Gloria's foster care depend on Gloria's conduct having been negligent. It was not. Thus, the mere presence of the children in the home in this case is insufficient to establish legal causation, regardless of the propriety or impropriety of the licensing or of the placement decision.

Finally, Beltran relies on *Babcock v. State*, 116 Wn.2d 596, 809 P.2d 143 (1991), in support of her argument. But *Babcock* is distinguishable. In that case, the court held that the State and its employees could be liable for negligence where they failed to follow applicable statutory and administrative requirements governing foster care. There, the evidence showed that the foster parent who had sexually abused the foster children had a criminal history for sexual offenses. The State had not done a criminal background check. In the present case, Christian St. Jacques had no such record which the State could or should have discovered. We, therefore, affirm the trial court's grant of summary judgment.

The Trial Court Properly Denied Beltran's Motion to Compel Discovery of the Caseworkers' Job Performance and Personnel Files

Under CR 26(b)(1), the court considers whether matters to be discovered are "relevant to the subject matter involved in the pending action." The standard of relevance for purposes of discovery is much broader than the standard required under the evidence rules for admissibility at trial. *Barfield v. City of Seattle*, 100 Wn.2d 878, 886, 676 P.2d 438 (1984). The fact that the evidence sought would be inadmissible at trial is not an impediment to discovery, "so long as the 'information sought appears [to be] reasonably calculated to lead to the discovery of admissible evidence.'" *Id.* at 886 (citations omitted).

We review the trial court's denial of appellant's discovery request for an abuse of discretion. *Id.* at 887.

There is an abuse of discretion when the discretion exercised is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

In the course of discovery, Beltran requested all information regarding the job performance and job qualifications of two DSHS employees: respondent Janet Engle and State caseworker Carol Mitchell. Respondents produced portions of the requested material but withheld the job performance evaluations and information concerning their job qualifications. Beltran filed a motion to compel production of these documents, which was denied.

First, Beltran's request for employee applications was properly denied because it conflicts with RCW 42.17-.310(1)(t), which provides that the following records are exempt from disclosure: "All applications for public employment, including the names of applicants, resumes, and other related materials submitted with respect to an applicant."

Second, Beltran's request for employment applications arguably exceeds the scope of discovery permitted under CR 26(b)(1). As the respondents claim, applications for employment would be relevant and discoverable only if Beltran had alleged that the employees were not qualified to be hired into their positions. Beltran did not make this claim in her complaint.

Third, Beltran had an opportunity to ask the caseworkers about these matters in depositions without breaching any statutory exemptions. All of the reasons above provide reasonable bases for the denial of Beltran's motion to compel discovery of the caseworkers' applications for employment and the trial court properly exercised its discretion in doing so.

We next examine Beltran's request, under the public disclosure act of 1972, for the caseworkers' performance evaluations. The public disclosure act of 1972, RCW 42.17, is a "strongly worded mandate for broad disclosure of public records." *Dawson v. Daly*, 120 Wn.2d 782, 788, 845 P.2d

995 (1995) (citing *Spokane Police Guild v. State Liquor Control Bd.*, 112 Wn.2d 30, 33, 769 P.2d 283 (1989)). To "promote complete disclosure" of public records, RCW 42.17.010 requires liberal construction of the Act. *Dawson*, 120 Wn.2d at 788.

In *Dawson*, the Washington State Supreme Court articulated a two-prong test that applies when considering a request for a public employee's performance evaluations. First, the court examines whether the disclosure sought would be highly offensive to a reasonable person if disclosed. And second, the court examines whether the information is of legitimate public concern. *Id.* at 796.

The *Dawson* court held that disclosure of employees' "performance evaluations, which do not discuss specific instances of misconduct, is presumed to be highly offensive within the meaning of RCW 42.17.255." Furthermore, "the evaluation of an individual's work performance, even if favorable, is personal information and its release is an invasion of privacy." *Celmins v. United States Dep't of Treasury*, 457 F. Supp. 13, 15 (D.D.C. 1977).

"Employment records would reasonably contain, among less sensitive information, references to family problems, health problems, past and present employers' criticism and observations, military records, scores from IQ tests and performance tests . . . and other matters, many of which most individuals would not willingly disclose publicly . . . ." *Missoulian v. Board of Regents*, 207 Mont. 513, 524, 675 P.2d 962 (1984) (quoting *Montana Human Rights Div. v. City of Billings*, 199 Mont. 434, 442, 649 P.2d 1283 (1982)).

The *Dawson* court also addressed whether a document is of legitimate public concern under the second prong of RCW 42.17.255. The court held this concern must be "reasonable." *Dawson*, 120 Wn.2d at 798. This analysis "contemplates some balancing of the public interest in disclosure against the public interest in the 'efficient administration of government.'" *Id.* at 798 (quoting RCW 42.17.010(11)). The court held disclosure of employees' per-

formance evaluations could affect the public's interest in efficient government in two ways.

First, if public employees were aware that their performance evaluations were freely available to their co-workers, their neighbors, the press, and anyone else who cares to make a request under the act, employee morale would be seriously undermined. The likely result would be a reduction in the quality of performance by these employees and discord in the workplace. *Ripskis v. Department of Hous. & Urban Dev.*, 746 F.2d 1, 3 (D.C. Cir. 1984).

Second, disclosure could cause even greater harm to the public by making supervisors reluctant to give candid evaluations. "Disclosure will be likely to chill candor in the evaluation process" *Ripskis*, 746 F.2d at 3. *See also Trenton Times Corp. v. Board of Educ.*, 138 N.J. Super. 357, 363, 351 A.2d 30 (1976) ("[w]ere all personnel evaluations known to be subject to public disclosure, candor in making them might well be compromised."). The quality of public employee performance would, therefore, suffer because the public employees would not receive the guidance and constructive criticism required for them to improve their performance and increase their efficiency. *Dawson*, 120 Wn.2d at 799-800. Applying these concerns to the facts presented in *Dawson*, the court held the public concern was not legitimate "at least in a case such as this one where our in camera review . . . revealed that [the employee's] evaluations do not discuss specific instances of misconduct or public job performance." *Id.* at 800.

In the instant case, the parties do not state, nor does the record reveal whether the trial court conducted an in camera review. We therefore do not know whether the caseworkers' personnel files would reveal instances of misconduct or anything else materially related to this case. In fact, Beltran fails to articulate even a basis for suspicion that the personnel files would contain relevant information. Thus, after considering the legitimate concerns for compromising public employee privacy articulated above,

we hold that the trial court did not abuse its discretion when it denied Beltran's motion to compel discovery.

## The Trial Court Properly Ordered that the Nonconviction Criminal Arrest Be Sealed and Struck from Consideration

Counsel for Gloria St. Jacques moved to strike nonconviction information submitted by the plaintiffs relating to a February 1990, domestic violence, fourth-degree assault arrest of Gloria St. Jacques. That charge had been dismissed. Beltran was using the information as evidence to show that DSHS negligently licensed St. Jacques to provide foster care. The trial court struck the evidence and ordered it sealed. Beltran assigns error to this order.

Washington's Criminal Records Privacy Act, RCW 10.97, generally provides for the "completeness, accuracy, confidentiality, and security of criminal history record information . . . ." RCW 10.97.010. Section 10.97.080 of the act states: "No person shall be allowed to retain or mechanically reproduce any nonconviction data except for the purpose of challenge or correction when the person who is the subject of the record asserts the belief in writing that the information regarding such person is inaccurate or incomplete."

Section 10.97.050 specifically controls the dissemination of nonconviction information. Beltran does not fall within any of the exceptions provided in the Act for those who are allowed access to this type of information.

Nonetheless, Beltran claims that RCW 10.97 restricts criminal justice agencies only from disseminating this type of information; thus, once St. Jacques' report was given to DSHS, RCW 10.97 no longer applies to the use of that information. This argument is inconsistent with the purpose of the Act: that criminal justice agencies (including courts) are generally prohibited from disseminating such information, and members of the public cannot mechanically reproduce such information unless they are the subjects of the information. It would be utterly inconsistent for this court to say that once the information surreptitiously fell

into the wrong hands, courts can ignore this statute which protects the privacy of individuals who have been the subject of police action but not convicted.

Beltran also relies on *Hudgens v. City of Renton*, 49 Wn. App. 842, 746 P.2d 320 (1987), despite the fact that *Hudgens* actually supports the trial court's order to strike and seal the nonconviction data. The *Hudgens* court permitted viewing of nonconviction data, but sustained the trial court's decision to prohibit copying or retaining the documents: "The statute [RCW 10.97.080] clearly states (1) that nonconviction information cannot be *retained* or *mechanically reproduced*, except in certain situations, and (2) that RCW 42.17 shall not be construed to require or authorize *copying* of the nonconviction information." *Id*. at 844-45.

Accordingly, it was improper for Beltran to reproduce the nonconviction report and present it as documentary evidence. Beltran was not authorized to obtain the information and the trial court properly remedied the unlawful dissemination of the information by ordering it to be stricken from the record and sealed.

Affirmed.

KENNEDY, C.J., and WEBSTER, J., concur.

Review granted at 140 Wn.2d 1021 (2000).