[No. 39029-5-I. Division One. March 30, 1998.]

Sabrina Whaley, *Individually and as Guardian, Appellant*, v. The State of Washington, et al., *Respondents*.

*Jo-Hanna G. Read* of *Law Office of Jo-Hanna Read,* for appellant.

*Christine O. Gregoire, Attorney General,* and *Janice E. Ellis, Assistant,* for respondent Department of Social and Health Services.

*Matthew T. Boyle* of *Mitchell, Lang & Smith,* for respondent Northwest's Child.

*James E. Niemer* of *Lane Powell Spears Lubersky,* for respondents Hupf.

BECKER, J. — This appeal presents issues of immunity and negligence. Reinstating a suit dismissed on summary judgment, we recognize a professional duty owed by a spe-

cialized provider of day care for developmentally disabled children in the use of a controversial technique called "facilitated communication" (FC). Because avoiding the infliction of emotional suffering is within the scope of the duty, the claim may proceed to trial though it asserts no actual or threatened physical harm. Liability may not be sought, however, for damages arising from an immunized report of child abuse.

## FACTS

The appellant, and plaintiff below, is Sabrina Whaley, personally and as guardian for S, her son. Her suit includes the State and one of its child abuse investigators among the defendants, but this appeal concerns only Whaley's claims against Northwest's Child and Darcy Hupf.[1] Northwest's Child is a licensed provider of specialized day care for school-aged children with developmental disabilities and holds itself out as offering support and training for such children, consistent with their regular school program. Darcy Hupf is the director. Whaley enrolled S at Northwest's Child in 1991, when S was seven years old.

That same year, the staff at Northwest's Child began using facilitated communication,[2] a method designed to compensate for communication difficulties arising from a developmentally disabled individual's lack of motor control. A person called a "facilitator" physically supports the hand

---

[1]The orders of summary judgment dismissing Northwest's Child and Hupf have been determined to be appealable under CR 54(b) and RAP 2.2(d).

[2]Other cases addressing issues raised by the use of facilitated communication (FC) include *Stepanek v. Delta County*, 940 P.2d 364, 368-71 (Colo. 1997) and *Callahan v. Lancaster-Lebanon Intermediate Unit 13*, 880 F. Supp. 319, 326-40 (E.D. Pa. 1994). In *Stepanek*, a county attorney petitioned for temporary guardianship of a severely retarded and nonverbal individual whose facilitated communications accused his father of sexually abusing him; the court held the attorney absolutely immune from a cause of action for attorney fees, but not immune from sanctions imposed pursuant to Civil Rule 11. In *Callahan*, an autistic boy was removed from parental custody when public school employees reported he was communicating through FC that his father was sexually abusing him; the governmental defendants were held to have qualified immunity from a suit alleging the deprivation of custody violated 42 U.S.C. § 1983.

of the disabled individual while encouraging the individual to push with that hand to indicate objects, pictures, or letters on a letter-board. Pointing to letters on a board, which the facilitator then writes down, is known as "typing." After conducting what she considered to be "extensive research," Darcy Hupf approved the use of FC with the children at Northwest's Child. She and several members of her staff received what Hupf recalls as "comprehensive training" in using the method.

█ Whaley's son, S, has a severe disability with some features of autism. His speech is limited mostly to single words with poor articulation. Though S was capable of using an actual keyboard without assistance, teachers at Northwest's Child began to "type" with him in 1992. Viewing the record in the light most favorable to Whaley,[3] Northwest Child's use of FC with her son beginning in 1992 created a false and misleading appearance that S was able to communicate at a much higher level than anyone had imagined possible.

According to prior evaluations, S was unable to read or spell, and was functioning at a mental age-equivalent level of a child two to three years old. Yet, at Northwest's Child, S began to produce "typings" which were quite sophisticated in diction and spelling. Some sentences from the transcripts, exactly as the facilitators said S spelled them, are "I need help defining myself"; "I dream of opening a playground for people with handicaps"; "I have hidden talents please help me it is not noticeable"; "Elizabeth can I be in the . . . Times not how I appear but how I really am?"; and "Inside is healthy why is outside unhealthy?"

Hupf and her staff accepted these remarkable communications at face value. They told Whaley the new method was a revolutionary breakthrough with amazing positive results. When Whaley raised questions about her son's performance in light of his prior assessed abilities,

---

[3]The court must consider the evidence presented in the light most favorable to the nonmoving party. *Waller v. State*, 64 Wn. App. 318, 326-27, 824 P.2d 1225 (1992).

the staff told Whaley that S had somehow absorbed his elevated reading and spelling level through books and television.

Many professionals who work with disabled persons were approaching FC more skeptically. By the time Northwest's Child began to "type" with S in December, 1992, criticism of FC was well documented in professional literature and the popular press. Controlled scientific evaluations demonstrated that communications do not originate with the disabled individuals, but rather with the facilitators, who typically report they are unaware of their control over the process. Facilitator influence had already been known to produce false reports of child abuse, a phenomenon discussed in the professional literature of the time. The record includes a declaration from Dr. Gina Green, Director of Research at the New England Center for Autism. According to Dr. Green, FC was at best experimental in 1992, and a facilitator should not have attempted it without first explaining the risks to the disabled individual's guardian, and obtaining written informed consent.[4]

The staff at Northwest's Child remained largely unaware of these concerns. Whaley says they did not inform her of risks involved with the use of FC or suggest there was any question as to the validity of her son's supposed communications. Whaley felt guilty that she had underestimated her son's abilities, and began to allow him greater independence and less supervision.

The facilitators produced "typings" from S on over 100 occasions from December, 1992, to August, 1993. One such session in March, 1993, resulted in a statement that S had been sexually abused by some strangers named "Fred" and "Helen." One of the messages literally read, "I have had a

---

[4]According to a neuropsychologist at Children's Hospital and Medical Center where S was tested in 1994, the sophisticated intelligence supposedly manifested by S through FC was entirely illusory. "We have had many families come to our clinic for assessment of their children's academic abilities and ability to communicate after great 'breakthroughs' have been experienced through the use of facilitated communication. Sadly, we have not encountered a single case where we are able to validate these 'breakthroughs'."

penus in my mouth . . . it was mine in Helens mouth." Whaley, when she learned of this, asked Darcy Hupf to consult an abuse professional. Hupf instead brought in an FC expert, but the expert was unable to get S to provide additional information. Hupf advised Whaley that she should simply wait to see what else her son might reveal. S grew sullen and visibly upset as the Northwest's Child facilitators continued to "type" with him and to probe for more information about sexual abuse.

On June 22, 1993, facilitators working with S generated a statement that "Helen" was actually his mother, Sabrina Whaley. To check the validity of this message, Hupf asked a different facilitator, who was not a Northwest's Child employee, to conduct a session with S. Unlike the staff, this individual had no access to the transcripts produced from prior sessions. Her session resulted in a message that S was scared and needed help. The next day, a session facilitated by two staff members at Northwest's Child again produced a statement to the effect that Whaley had been molesting S for a long time and he was afraid of her.

Northwest's Child did not inform Whaley of these developments. Instead, on July 26, 1993, Hupf reported to Child Protective Services (CPS) that S was alleging that Whaley had been sexually abusing him. Hupf told CPS that these allegations were made through FC, but she did not express any doubts as to the reliability of this method of communication. A CPS investigator came to the center and obtained further information from the staff. At the insistence of CPS, S had to live with other relatives and have no contact with Whaley while the investigation proceeded. CPS concluded the investigation and allowed S to return to Whaley's custody after a separation of eight days.

Whaley's negligence suit claims she and her son suffered extreme anxiety, depression, and damage to their relationship as a result of these events. The trial court, on summary judgment, held Hupf and Northwest's Child immune from liability for reporting suspected child abuse to CPS. The trial court then dismissed the negligence claims to the

extent they survived the ruling on immunity. From these rulings, Whaley appeals.

## IMMUNITY

We first determine whether the trial court, on a motion for summary judgment by Northwest's Child and Hupf, properly granted them immunity from liability for making a report of child abuse to CPS.

Under RCW Chapter 26.44, certain types of practitioners, including licensed child care providers and their employees, are required to report to "the proper law enforcement agency or to the department" whenever they have "reasonable cause" to believe that a child has suffered abuse.[5] Immunity from liability is provided to "any person participating in good faith in the making of a report pursuant to this chapter":[6]

(1)(a) Except as provided in (b) of this subsection, any person participating in good faith in the making of a report pursuant to this chapter or testifying as to alleged child abuse or neglect in a judicial proceeding shall in so doing be immune from any liability arising out of such reporting or testifying under any law of this state or its political subdivisions.

(b) A person convicted of a violation of subsection (4) of this section shall not be immune from liability under (a) of this subsection.

. . .

(4) A person who, intentionally and in bad faith or maliciously, knowingly makes a false report of abuse or neglect shall be guilty of a misdemeanor punishable in accordance with RCW 9A.20.021.[7]

■■ ■ In reviewing summary judgment, the appellate court makes the same inquiry as the trial court. The burden

---

[5]RCW 26.44.030(1)(a).

[6]RCW 26.44.060(1)(a).

[7]RCW 26.44.060.

is on the moving party to demonstrate that there is no genuine dispute as to any material fact. A motion for summary judgment should be granted only if, from all the evidence, reasonable persons could reach but one conclusion.[8]

■ Hupf initially argues Whaley cannot defeat the claim of immunity because Whaley has not alleged Hupf acted in bad faith. But the necessity of alleging bad faith under the statute arises only in cases charging criminal liability under RCW 26.44.060(4) for making a false report. The central issue here is whether Hupf, who has the burden of proving that she made the report in good faith,[9] has met that burden on summary judgment as a matter of law.

Hupf makes a prima facie showing of good faith through her declaration saying, "I had no reason to believe the allegations were untrue. I did not intend to cause a separation of Sabrina and [S]. Rather, I reported the allegations to CPS because I was concerned for [S]'s health and welfare, and because I was aware that I was required by law to report the allegations."

■ Whaley attempts to raise an issue of fact as to Hupf's good faith by showing Hupf's report to CPS was based entirely on information she should have known was not genuine. But there is no legal requirement that information giving rise to a suspicion of child abuse be investigated or verified before it is reported. RCW 26.44.050 imposes the duty of investigation upon the authorities who receive the report, not upon those who make the report.[10] The purpose of the statutory grant of immunity, to encourage the reporting of child abuse,[11] would not be served if immunity could be defeated simply by showing the reporter passed on unverified or uninvestigated information. Thus, a traditional negligence standard—based on what the

---

[8]*Spurrell v. Bloch*, 40 Wn. App. 854, 860, 701 P.2d 529 (1985).

[9]*See Lesley v. Department of Soc. & Health Servs.*, 83 Wn. App. 263, 274, 921 P.2d 1066 (1996).

[10]*Lesley*, 83 Wn. App. at 273.

[11]*City of Seattle v. Shin*, 50 Wn. App. 218, 223, 748 P.2d 643 (1988).

reporter reasonably should have known—is not used to determine whether immunity will attach.[12] Rather the question is whether the reporter acted "with a reasonable good faith intent, judged in light of all the circumstances then present."[13]

The standard definition of good faith is a state of mind indicating honesty and lawfulness of purpose.[14] Nothing in the record suggests that Hupf was dishonest in reporting her suspicion of abuse or that she acted with any unlawful purpose. The fact that she, as a child care provider, was subject to criminal penalties if she reasonably suspected abuse and failed to report it[15] is a compelling consideration on the side of concluding her purpose was lawful. Also dispelling any inference of dishonesty or improper purpose is the fact that Hupf attempted to validate the "typings" about sexual abuse by having different staff members conduct the sessions, and consulted with both a public health nurse and a police officer before making the report. In light of these circumstances, a reasonable jury would necessarily conclude that her report to CPS was made in good faith.

■ Whaley contends immunity, if granted, should be limited to the initial telephone call. She says that when the CPS investigator came to Northwest's Child to obtain further information, Hupf failed to inform him that FC was untested and controversial, that it had produced inconsistent messages from S, and that the messages themselves were inconsistent with S's assessed level of functioning. Hupf, she contends, should remain liable for these post-report interactions with CPS. But the statutory immunity is not limited to the initial report.[16] The supplying of further information to follow up the initial report is in this

---

[12]*See Spurrell v. Bloch*, 40 Wn. App. at 866-67; *Lesley*, 83 Wn. App. at 275.

[13]*Dunning v. Pacerelli*, 63 Wn. App. 232, 240, 818 P.2d 34 (1991).

[14]*Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 385, 715 P.2d 1133 (1986).

[15]RCW 26.44.080.

[16]*Lesley*, 83 Wn. App. at 280-81.

case inseparable from the making of the report itself. We conclude it is protected by the same immunity, though the information reported may have been incomplete or inaccurate.

The immunity provided by RCW 26.44.060(1)(a) is extended to "any person participating in good faith in the making of a report." Whaley argues that Northwest's Child does not share any immunity that Hupf may have for making the report because Northwest's Child is not a "person." But we must read the reference to "person" together with the preceding section of the law that imposes a duty of reporting upon "licensed or certified child care providers or their employees" as well as other practitioners.[17] Northwest's Child is a licensed child care provider and is therefore entitled to immunity for good faith reporting of child abuse to the same extent as Hupf.

We conclude that Whaley has not raised an issue of fact defeating the showing that Hupf supplied all information to CPS in good faith. Therefore, Hupf and Northwest's Child are immune from any liability arising out of reporting child abuse to CPS, including any liability for the eight-day separation that occurred as the result of that report.

In a cross-appeal, Hupf and Northwest's Child contend their immunity from any liability "arising out of"[18] their reporting protects them generally from all claims arising from their use of FC with Whaley's son. With this contention, we disagree. "The making of a report"[19] is the only conduct for which the statute provides immunity. The persistent efforts by Northwest's Child's staff to engage S in FC during the months before the report to CPS produced visible disturbance in S, who reportedly closed his eyes and made growling noises when asked to "type." Whaley says she was devastated upon being told that her son was reporting he had been sexually abused. Whaley also claims the

---

[17]RCW 26.44.030(1)(a).

[18]RCW 26.44.060(1)(a).

[19]Id.

relationship between herself and her son was adversely affected as the result of the false information she received about his abilities and communications. These damages, if proved, were caused not by the making of a report of child abuse, but by the use of FC. Such conduct is not protected by immunity and may give rise to liability.

In conclusion, we affirm the summary judgment ruling of the trial court granting immunity for liability arising out of the making of the report, but denying immunity from suit for damages caused by the use of FC in the months leading up to the making of the report.

## NEGLIGENCE

The trial court dismissed Whaley's negligence claims arising from the use of FC, ruling that Whaley failed as a matter of law to show the foreseeability of damages from the use of FC, and therefore failed to establish the necessary element of duty.

Whether a duty exists is a question of law for the court.[20] The Supreme Court recently recognized the duty of a group home to protect its vulnerable developmentally disabled residents from all foreseeable harms.[21] A theory of negligence based on an analogy to this duty cannot, however, provide a basis for reversing the order of summary judgment dismissing Whaley's negligence claims because Whaley did not present it in the trial court and did not discuss it in this court until her reply brief. We limit our analysis of duty to Whaley's contention that Northwest's Child owed her and her son a duty to provide for his care, custody and control in accordance with professional standards for the care of developmentally disabled children.

Hupf argues she owed no such duty because

---

[20]*Funkhouser v. Wilson*, 89 Wn. App. 644, 950 P.2d 501, 505 (1998).

[21]*Niece v. Elm View Group Home*, 131 Wn.2d 39, 49, 929 P.2d 420 (1997); *see also Funkhouser v. Wilson*, 950 P.2d at 505-06; *J.N. v. Bellingham Sch. Dist. No. 501*, 74 Wn. App. 49, 59-60, 871 P.2d 1106 (1994).

there is no legislatively defined standard of care for professional caretakers of disabled individuals, as there is for health care providers. But the existence of a professional duty does not depend on legislation. Our courts have on several occasions recognized a duty to follow a professional standard of care that has not been prescribed by statute.[22]

Recognition of a duty generally depends on policy considerations and the balancing of interests.[23] Northwest's Child held itself out as having special competence in the care of disabled children, and represented its staff as being trained in the use of a method of communication that is unfamiliar to an ordinary person. Northwest's Child has not shown that its use of FC with S had any particular utility that would outweigh the risk of harm, or that the obligation to comply with professional standards would impose an undue burden. The children at Northwest's Child, unable to speak for themselves, were especially vulnerable to harm from the use of experimental methods of communication. In light of these considerations, we hold the staff at Northwest's Child had a duty to exercise that degree of skill and knowledge normally possessed by members of their profession with respect to FC.[24]

According to Dr. Green's testimony, professional standards required objective evaluation of the validity of the technique for each student, safeguards against its known and potential negative side effects, and the obtaining of informed consent. Dr. Green's testimony raises an issue as to whether Hupf and her staff breached a professional duty.

The only damages Whaley alleges are mental

---

[22]*See, e.g., Walker v. Bangs*, 92 Wn.2d 854, 859, 601 P.2d 1279 (1979) (standard of care in attorney malpractice action); *Lewis v. Scott*, 54 Wn.2d 851, 858, 341 P.2d 488 (1959) (knowledge of a reasonably prudent expert is imputed to one who held himself out as an expert in furnace installation); *Lund v. Caple*, 100 Wn.2d 739, 747, 675 P.2d 226 (1984) (conceivable that a malpractice action would be appropriate where a counselor fails to conform to an appropriate standard of care, injuring the spouse who is a patient and thereby causing loss of consortium damages to the other spouse).

[23]*See, e.g., Hunsley v. Giard*, 87 Wn.2d 424, 434-35, 553 P.2d 1096 (1976); *Funkhouser v. Wilson*, 950 P.2d at 506.

[24]*See* RESTATEMENT (SECOND) OF TORTS § 299A (1965).

and emotional in nature. Without citing authority, Hupf contends the court may not impose a duty of care, such as the duty to act in accordance with professional standards, unless *physical* harm is a foreseeable risk of the alleged misconduct. Even if this contention were correct, it probably would not avoid imposition of a duty in the present case, because physical as well as emotional injury is an arguably foreseeable result of using unreliable methods to communicate with disabled individuals. But under *Hunsley v. Giard*, it is no longer correct to say that recovery for emotional distress in a negligence suit depends on a showing of actual or foreseeable physical harm.[25] *Hunsley* removed, as an artificial obstacle in any negligence claim, "the then general rule of no liability for mental distress where the defendant's actions were negligent and there was no impact to the plaintiff."[26] The plaintiff who suffers mental distress "has a cause of action; that is to say, the defendant has a duty to avoid the negligent infliction of mental distress. It is not necessary that there be any physical impact or the threat of an immediate physical invasion of the plaintiff's personal security."[27]

Hupf contends Whaley's claim for negligent infliction of emotional distress is entirely separate from her claim for breach of a professional duty, and is established by a different legal standard. The only different or artificial legal standard is that mental and emotional suffering, to be compensable in an action for negligent infliction of emotional distress, must be "manifested by objective symptomatology."[28] Otherwise, the traditional concepts of duty, breach, causation and damages govern the right to recover when emotional distress is the only damage claimed.[29] There is no reason why Whaley, though claiming only emotional

[25]*Hunsley v. Giard*, 87 Wn.2d at 435.

[26]*Gain v. Carrol Mill Co.*, 114 Wn.2d 254, 257, 787 P.2d 553 (1990).

[27]*Hunsley v. Giard*, 87 Wn.2d at 435.

[28]*Id.* at 436.

[29]*Id.* at 434.

distress damages, should not be able to pursue her action for the breach of an established professional duty so long as avoiding emotional distress was within the scope of that duty.

 The scope of any duty is bounded by the foreseeable range of danger.[30] A defendant who is under a duty of care is liable for emotional distress caused by a breach of that duty if emotional distress was a field of danger that the defendant should reasonably have anticipated and guarded against.[31] Whether a defendant reasonably should have anticipated a general field of danger is a factual question that may properly be put to a jury,[32] unless the circumstances of the injury are highly extraordinary.[33] Thus, our inquiry on summary judgment is whether a jury could find that the negligent use of FC foreseeably put Whaley and S at risk of emotional distress. Inherent in that inquiry is that the reaction of the plaintiff must be that of a "normally constituted" person, absent defendant's knowledge of some peculiar characteristic or condition of plaintiff.[34]

Whaley's evidence, if believed, establishes that the creation of false reports was a risk that should have been known to persons holding themselves out as experts in the use of FC. In fact, the record suggests that Northwest's Child had been warned about the specific risk of generating false reports of sexual abuse. The special vulnerability of S, a retarded child and largely nonverbal, was well known at Northwest's Child. It is therefore not unforeseeable as a

---

[30]*Wells v. City of Vancouver*, 77 Wn.2d 800, 803, 467 P.2d 292 (1970).

[31]*Cf.* WPI 12.05 (Instruction on "Negligence—Intervening Cause." Foreseeability as a limitation on the scope of a duty has much in common with the concept of independent intervening cause, in that both raise the factual question "whether the actual harm fell within a general field of danger which should have been anticipated." *McLeod v. Grant County School Dist. 128*, 42 Wn.2d 316, 321, 255 P.2d 360 (1953). Modern decisions tend to hold that foreseeability as a factual matter is more appropriately considered in connection with duty, not proximate cause. *See, e.g., Rikstad v. Holmberg*, 76 Wn.2d 265, 268, 456 P.2d 355 (1969).

[32]*Wells v. City of Vancouver*, 77 Wn.2d at 803.

[33]*Shepard v. Mielke*, 75 Wn. App. 201, 206, 877 P.2d 220 (1994).

[34]*See Hunsley v. Giard*, 87 Wn.2d at 436.

matter of law that creating false statements and attributing them to S would cause him emotional distress. Nor was it unforeseeable that a normally constituted mother of such a child would also experience mental suffering as the result of this conduct. A jury could thus find that the plaintiffs' emotional damage was within a general field of danger that the staff at Northwest's Child, as part of their professional duty of care in the use of FC, should have anticipated and guarded against.

We conclude that Whaley has established the existence of a professional duty and has raised issues of fact as to the foreseeability of emotional harm when FC is used in a way that falls below professional standards. The record contains sufficient evidence that the claimed mental and emotional suffering was manifested by objective symptomatology. Whaley's declaration, and the assessment of a social worker, show that she and her son suffered emotional distress "above that level which is a fact of life."[35] The dismissal of Whaley's action against Hupf and Northwest's Child for emotional distress caused by professional malpractice is therefore reversed and remanded for trial.

In a separate claim of negligence involving conduct completely distinct from the use of FC, Whaley alleges that Hupf carried on a three-month campaign designed to force her to obtain unnecessary medical treatment for certain health problems her son frequently experienced. Whaley has not shown that Hupf's conduct breached a duty. A duty to avoid infliction of emotional distress arises only where conduct is unreasonable in proportion to the danger.[36] The boy's health problems included bowel control as well as a skin rash and nosebleeds. Even if not dangerous to himself or the other children, these conditions were a matter of justifiable concern to his caretakers. Hupf's insistence that Whaley find a resolution for these problems may have been annoying and intimidating, but the risk of causing measur-

---

[35]*Spurrell v. Bloch*, 40 Wn. App. at 863.

[36]*Hunsley v. Giard*, 87 Wn.2d at 435.

able emotional damage was slight, and the conduct was not unreasonable in view of that slight risk.[37] As a matter of law, we hold this conduct was not negligent, and exclude it from consideration on remand.

## NEGLIGENT HIRING AND SUPERVISION

██ Whaley alleges that Northwest's Child was negligent in hiring one of the teachers. A claim of negligent hiring presupposes that the employee in question was unfit for the job.[38] Whaley claims the teacher was unfit because she did not have a degree in education and was not a state certified teacher. But Northwest's Child is a state licensed child day care facility, not a school, and the record shows that the employee met all state qualifications for being a "teacher" at Northwest's Child. The trial court properly granted summary judgment on this claim.

Whaley also alleges negligent supervision of the employees at Northwest's Child. The trial court dismissed this claim on the basis that no negligence had been shown in the conduct of any of the staff. In view of our ruling recognizing the existence of a duty Hupf and her staff may have breached, this basis for the ruling was erroneous, and it is reversed.[39]

Affirmed in part; reversed in part.

COLEMAN and ELLINGTON, JJ., concur.

---

[37]Compare *Keates v. City of Vancouver,* 73 Wn. App. 257, 266-67, 869 P.2d 88 (1994) (aggressive interrogation of criminal suspects does not constitute unreasonably dangerous conduct in light of its social utility compared to the minimal risk) *with Corrigal v. Ball & Dodd Funeral Home, Inc.,* 89 Wn.2d 959, 962, 577 P.2d 580 (1978) (defendant funeral home's shipment of cremated remains without an urn could constitute conduct that was unreasonably dangerous in light of the foreseeable risk of emotional distress to the recipient).

[38]*See Carlson v. Wackenhut Corp.,* 73 Wn. App. 247, 252-53, 868 P.2d 882 (1994); *Guild v. St. Martin's College,* 64 Wn. App. 491, 498-99, 827 P.2d 286 (1992).

[39]Reversal is without prejudice to renew the motion upon a different basis. *See Gilliam v. Department of Soc. & Health Servs.,* 89 Wn. App. 95, 950 P.2d 20, 28-29 (1998) (where defendant agency disavows any claim that its employees were acting outside the scope of employment, negligent supervision claim is properly dismissed as redundant of other negligence claims).

Reconsideration denied April 28, 1998.