6 P.3d 112 (2000)
Mark MILES and Yamila Miles, husband and wife, and Mark Miles as Guardian ad Litem for Justin Miles, Christopher Miles and Michael Miles, minors, Appellants,
v.
STATE of Washington, CHILD PROTECTIVE SERVICES DEPARTMENT; Children's Hospital; Dr. Kenneth Feldman and "Jane Doe" Feldman, husband and wife; Wanda Akers and "John Doe" Akers, wife and husband; and John Does and Jane Does 1-5, Respondents.
No. 24457-8-II.
Court of Appeals of Washington, Division 2.
August 18, 2000.
*114 John Louis Messina, Jeffrey Howard Sadler, Stephen Louis Bulzomi, Messina Law Firm, Tacoma, for Appellants.
Carrie L. Bashaw, Asst. Atty. Gen. Tort Claims, Olympia, Kimberly Diane Ellwein Baker, Williams Kastner Gibbs, Howard Mark Goodfriend, Edwards, Sieh, Smith & Goodfriend P.S., Seattle, for Respondents.
*113 MORGAN, J.
Mark and Yamila Miles, individually and as guardians for their children, filed a complaint alleging they were wrongfully separated from their children by the State, caseworker Wanda Akers, Children's Hospital, and Dr. Kenneth Feldman. The trial court dismissed the complaint after granting the defendants' motions for summary judgment. We affirm.
In 1993 and 1994, Mr. and Ms. Miles were living near San Antonio, Texas, where he was stationed as a member of the Army. They were caring for their three children, Justin, born August 10, 1998, Christopher, born August *115 10, 1990, and Michael, born November 27, 1992. Dr. Tomasovic and Dr. Pinero were treating all three for apnea, bradycardia, chronic lung disease characterized as pulmonary fibrosis, recurrent pneumonia, severe gastroesophageal reflux, recurrent vomiting and diarrhea, chronic demyelinating disease of the central nervous system, anemia, and allergies. Treatment included extensive cardiac monitoring and home nursing care.
In August 1994, the Army transferred Mr. Miles to Fort Lewis, Washington. His family moved with him.
In early September 1994, the Miles took their three children to Madigan Army Medical Center. Dr. Moffitt, an Army pediatric pulmonologist, examined the children and spoke with Drs. Tomasovic and Pinero. He thought the children might not be genuinely ill.
On September 19, 1994, the Miles took one child, Michael, to Dr. Ricker, a civilian pediatric pulmonologist in Tacoma. He suspected Munchausen's Syndrome By Proxy (MSBP) and reported possible child abuse to Child Protective Services (CPS).
On November 7, 1994, Kathleen Knorr, a pediatric social worker at Madigan, did a "psychosocial" evaluation at Dr. Moffitt's request. She suspected MSBP and reported possible child abuse to CPS.
On November 21, 1994, CPS assigned social worker Wanda Akers to investigate Ricker's and Knorr's reports. Madigan asked her to "stand by" while further evaluation was done at Children's Hospital in Seattle.
Beginning December 5, 1994, the children were admitted to Children's Hospital for eight days of intensive observation. During those eight days, the children were seen or discussed by a health-care team that included (1) Jackie Brandt, MSW, a social worker; (2) Marla Sanger, RN; (3) Ann Ongerth, MSW, a social worker; (4) Elaine Valentine, MSW, a social worker; (5) Carol Mason, M.Ed and manager of the Children's Protection Program; (6) Jill Cole, DSW, a social worker; (7) DessyeDee Clark, Ph.C., ARNP, CNS, a child psychiatric nurse practitioner; (8) Kenneth Feldman, M.D., a pediatrician; (9) Adrian Gewing, RN; (10) Kathleen Knorr, MSW, a pediatric social worker from Madigan; (11) Bill Walker, M.D., a physician from Madigan; (12) Jeanne Johnson, RN; (13) Steve Chapman, M.D., a pediatrician; (14) Tao Kwan-Gett, M.D., a pediatrician; (15) Dr. Swain, a pediatric surgeon; (16) Susan Casey, a nutritionist; (17) Karin Weiler, M.D., a pediatric resident; (18) Sanford Melzer, M.D., the "attending physician"; (19) Nora Davis, M.D., the apnea program's director who performed sleep studies; (20) Lee Bossung-Sweeney, RNC, MN, an apnea nurse clinician; (21) Sonja Budhecha, M.D., a pulmonologist; (22) Bonnie Ramsey, M.D., a pediatric pulmonologist; (23) Kyle Colvin, M.D., a radiologist; (24) Eric Effman, M.D.; and (25) Akers.
On December 7, 1994, Dr. Feldman issued an extensive written report on each child. He stated "that overall the children's medical histories are dramatically disproportionate to their objective findings," and "this is a situation of [MSBP]."[1] He also reported possible child abuse to CPS.
On December 9, 1994, the health care team met at Children's. Those present included Drs. Feldman, Chapman, Gett, and Walker; nurses Clark, Sanger, Johnson, and Gewing; social workers Brandt, Valentine, Cole, Ongerth, and Knorr; plus Mason and Akers. The team concluded that the children had received "excessive and inappropriate invasive medical procedures[,]" resulting in "negative impacts on the childrens' growth, development[,] and mental health status."[2] Accordingly, it recommended foster care and placed the children on a 72-hour medical hold. It also informed Mr. and Ms. Miles that the hold had been placed; that CPS would be filing a dependency petition; and that the children would be going to foster care.
Still on December 9, Akers spoke over the phone with the children's maternal grandmother, Iris Barno. Barno offered to come to Washington and care for the children. Akers responded, according to Barno, "that I *116 could not take care of the children because I gave birth to a monster and was as bad as my daughter was."[3] Akers also asserted, according to Barno, that the children's grandfather had done blood tests on the children without authority, and that Ms. Miles had lied about her father's death and her own education. Finally, Akers asked, according to Barno, if Ms. Miles "took something or did something to herself to make her skin white because Puerto Rican's [sic] do not have white skin."[4]
By December 13, 1994, several professionals had submitted written reports. Nurse Clark's report stated that each child was "at risk for psychosocial and academic delays and possible distorted identity formation due to being reared in an intense sick-role environment that is not warranted for the level of actual physical findings."[5] She believed this was consistent with MSBP, and she recommended that the children be removed from the home. Dr. Melzer and Dr. Weiler's report diagnosed MSBP for all three children, and mild sleep apnea for Michael only. They indicated that "[a]fter extensive evaluation by all team members, it was decided that this was indeed a case of [MSBP] and that [each child] would be better served by being placed in foster care[.]"[6]
Also on December 13, 1994, Dr. Moffitt sent a report to CPS. His impressions, he stated, were "that the Miles children were essentially normal and did not require extensive monitoring or oxygen and medication treatments, and that this most likely represented [MSBP]."[7] He thought "that the children should be placed in foster care and observed away from their parents, pending further social services evaluation of this situation."[8]
On December 13, 1994, Akers filed a dependency petition on each child. Each petition alleged that the child was abused or neglected, and had no parent or guardian capable of providing adequate care.
At about the same time, Akers temporarily placed the children with a foster family. She knew of the events described above, but she had not done any investigation of her own.
On December 16, 1994, the Pierce County Juvenile Court convened a shelter care hearing at which Dr. Feldman testified.[9] He opined that the children were subject to MSBP, and he recommended that the children be placed outside the family home. The hearing was continued for a week so that Mr. Miles could be evaluated.
On December 23, 1994, the court ordered that the children could live with Mr. Miles, but that Ms. Miles could not also live in the home. The order was implemented on December 29, 1994, when the children returned from vacation with the foster family.
On January 5, 1995, the court entered an order allowing Ms. Miles to visit the children under supervision. The court did not allow Ms. Miles to prepare the children's food or arrange medical care.
In June 1995, Ms. Miles was evaluated by Dr. Darrow A. Chan, a clinical psychologist. After noting "that the boys' health [had] improved dramatically once they were removed from [Ms. Miles'] care[,]" he stated:
On any informal checklist, [Ms. Miles] would likely meet the criteria for [MSBP]. However, there is no concrete evidence that [Ms. Miles] actively engaged in any behaviors inducing these illnesses in her sons. There is also no evidence of tampering with equipment or active falsification of data. Without some concrete evidence, I cannot diagnose this situation as being a case of [MSBP]. However, the lack of this "diagnosis," should by no means minimize the seriousness of this situation. Without an intervention, these boys were at great *117 risk for unnecessary chronic medical problems with the possibility of the development of more serious symptoms.[[10]]
On July 17, 1995, the superior court entered an "Agreed Order of Dependency"[[11]]. It was expressly agreed to and signed by Mr. Miles and his attorney, and Ms. Miles and her attorney. It stated:

FINDINGS OF FACT
A. The dependency petition is amended in its entirety, and now states the following allegations:
1. The children were found to be under inappropriate medical care in that they were being treated for medical conditions which did not exist, and over treated for medical conditions which did exist.
2. Ms. Miles, in conjunction with various health care providers, furthered the unfounded medical treatment through reporting a variety of symptoms to various health care professionals, and exhibited a reluctance to decrease medical treatment.
3. The Miles children were diagnosed, in December 1994, as suffering from [MSBP]. However, upon extensive review of the medical record by professionals retained by DSHS, and by Ms. Miles, such diagnosis cannot be supported on a more probable than not basis.
4. Mr. Miles, at this time, may not fully understand the behavior of both his wife, and of the medical profession, which led to the unfounded and inappropriate medical care of his children.
5. There is concern that the children are at risk because Ms. Miles may be dependent on the medical care system.
B. The child[ren] should be placed in the parent's home, with both parents.
C. Reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home and to make it possible for the child to return home and the child should remain home, with both parents, under DSHS supervision because:
. . . .
Other: Court supervision is necessary to insure that unfounded and inappropriate medical care is not furthered by Ms. Miles.
. . . .
E. The below signed parties agree to the establishment of dependency pursuant to RCW 13.34.030(4)(b)(abused or neglected)[.][[12]]
With the Miles' concurrence, the court then concluded that the children "should be found dependent pursuant to RCW 13.34.030(4)(b)," and that the children should be placed with both parents on condition that:
1. DSHS shall work with the Miles' [sic] to select one team of physicians to monitor the children's health. One physician with complete knowledge of this family's history needs to coordinate all medical concerns. The children will need to be evaluated on an established schedule set up by the lead physician.
2. A homebuilders specialist shall visit the home in Michigan at least once per month to insure that a new cycle of increasing unfounded medical concerns does not begin. Any new concerns must be evaluated outside the home to insure that no one is influencing the test results.
3. The children shall be enrolled in a public or private school, when they reach the appropriate age, to insure some monitoring of their health and absences.
4. Mr. Miles needs to understand the nature of the risks to his children, even though Ms. Miles has not been diagnosed with [MSBP].[[13]]
Fifteen months later, in October 1996, the Miles[14] sued the State and Akers for negligent *118 investigation, violation of 42 U.S.C. § 1983, negligent infliction of emotional distress, and outrage. In the same complaint, they also sued Children's and Dr. Feldman for negligent diagnosis, negligent infliction of emotional distress, and outrage.[15]
On April 20, 1998, the State moved for summary judgment. In response, Ms. Miles declared:
[M]y husband and I signed the agreed order of dependency only to return the children back to their family home from foster care. By signing the agreed order of dependency, we were not admitting that we provided inappropriate medical care or overtreated by reporting unfounded medical symptoms.
My only concern at that time was the safety and welfare of my children and placing them back into the family home was the reason I signed the agreed order of dependency. I felt that I had no other choice but to enter into this agreed order.[[16]]
Two experts retained by the Miles declared that the MSBP diagnosis was wrong and that Dr. Feldman had made it hastily and recklessly. In 1999, after a series of hearings, the trial court granted the defendants' motions and dismissed all claims against all defendants.

I.
A preliminary question is whether the agreed order of dependency precludes the Miles from now claiming that their children were not abused or neglected in the fall of 1994. The Miles answer no, alleging they "had no other choice but to enter into this agreed order."[17] The defendants answer yes, based on collateral estoppel.
The defendants are correct. Collateral estoppel precludes a party from relitigating an issue of fact that the party has already litigated to final judgment, so long as injustice does not result.[18] A key issue of fact in the dependency action was whether the Miles had abused or neglected their children prior to December 5, 1994. The dependency court resolved that issue by entering a judgment that was final and appealable.[19] In that judgment, it ruled that the children were dependent within the meaning of RCW 13.34.030(4), which is equivalent to saying the children were abused or neglected.[20] Assuming without holding that the Miles could attack the trial court's judgment directly (i.e., by motion made in the dependency action), they may not attack it collaterally (i.e., by relitigation in a separate action such as this). For purposes of this case, the Miles are bound to the proposition that their children were abused or neglected in 1994.[[21]]

*119 II.
In their brief on appeal, the Miles describe their claims against the State as follows:
Wanda Akers, a state social worker, negligently investigated the alleged abuse of the Miles children. In addition, ... Wanda Akers made discriminatory, offensive, oppressive, and outrageous remarks about Yamila Miles which constitute negligent infliction of emotional distress (NIED), outrage, and a violation of her civil rights under 42 U.S.C. § 1983.[[22]]
We consider negligent investigation first and the alleged remarks second.

A.
The Miles' negligent investigation claim is really a claim that Akers negligently removed the children from the Miles' home, thereby disrupting the family and causing emotional distress. There is no claim that Akers placed the children in a foster home that was harmful or inadequate.
Attempting to support this claim of negligent removal, the Miles urge that a reasonable person would have investigated by "interviewing the parents, children, and all other parties involved[,]"[23] and that but for Akers' failure to conduct such interviews, the State would not have removed the children from the home. The State responds that Akers "conducted a level of investigation appropriate to the circumstances[,]"[24] and that her duty of reasonable care did not require her to "challenge Washington physicians' medical opinions under these circumstances."[25]
The State is correct. If Akers had contacted the Texas doctors, they might have said the children were genuinely sick while in Texasbut Akers would still have been faced with the views of twenty-six Washington health care providers, from Madigan, Children's, and private practice, to the effect that the children were currently abused. Akers also was told by both Madigan and Children's that those institutions had contacted the Texas doctors. Under these circumstances, a trier of fact could not infer that a reasonable person in Akers' shoes would not have removed the children from the home but for Akers' allegedly negligent omissions, and reasonable minds could not differ on the lack of proximate cause.
Attempting to further support their claim of negligent removal, the Miles urge that RCW 26.44.030(8)[26] required Akers to obtain a second opinion from a physician of the parents' choice; that Akers failed to do that; and that but for her failure, the State would not have removed the children from the home. The State responds that "[a]fter six physicians and two hospitals gave their medical opinions that abuse and neglect had occurred and at least five of the doctors indicated that the children would be endangered if returned to the parents' custody," it was neither reasonable nor mandatory "for the State to suggest that they select yet another physician[.]"[27]
*120 The State is correct. All the health care providers who saw the children in Washingtonthey were numerous, and none was selected by the Statesuspected or believed that the children were currently being abused through significant overtreatment. It cannot be inferred that one more doctor would have thought the children were not being abused, and even if it could be, it cannot be inferred that his or her view would have caused a reasonable person in Akers' shoes not to remove the children from the home. Assuming without holding that RCW 26.44.030(8) required an additional opinion, a rational trier of fact could not find that but for the absence of such an opinion, a reasonable person in Akers' shoes would not have removed the children from the home.
Finally, the State claims that even if a rational trier could find negligence, causation, and damages, it and Akers are immune from liability. The Miles respond that immunity is a factual question because Akers' alleged remarks support an inference that she lacked good faith.
RCW 26.44.056(3) provides that "[a] child protective services employee ... shall not be held liable in any civil action for the decision for taking the child into custody, if done in good faith under this section." Akers' alleged remarks are sufficient to support an inference of boorishness; without more, however, they are insufficient to support an inference that Akers was acting without good faith, given that she was adhering to the opinions of many doctors, nurses, and other health care workers at both Madigan and Children's. We conclude that a rational trier could not find causation, and that a rational trier would be obligated to find good faith.

B.
We turn to Akers' remarks, which the Miles characterize as "discriminatory, offensive, oppressive, and outrageous."[28] We consider NIED, outrage, and 42 U.S.C. § 1983, in that order.
A plaintiff may not sue for NIED unless he or she was present when, or shortly after, the negligent conduct occurred.[29] The Miles cannot meet this requirement with respect to Akers' alleged remarks to Barno, and in our view Akers' single alleged statement to Mr. Miles will not support, by itself, an action for NIED.[30]
A plaintiff may not sue for outrage unless he or she was present when the conduct occurred.[31] The conduct must also be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community;"[32] "mere insults and indignities, such as causing embarrassment or humiliation, will not support imposition of liability."[33] Akers' remarks, except one, were not made in the Miles' presence; and that one, by itself, was not "so extreme in degree" as to support a claim of outrage.
A plaintiff may not sue under 42 U.S.C. § 1983 unless the defendant's conduct violated a clearly established constitutional right.[34] A plaintiff bears the burden of identifying *121 and showing such a right.[35] The Miles make little attempt to identify such a right here;[36] in a single sentence of their opening brief, they claim "that the defendants deprived the Miles family members of their fundamental right to each other's companionship[,]"[37] and in a single sentence of their reply brief they claim "that Ms. Akers contributed to the deprivation of the Miles' fundamental right to their children's companionship."[38] They do not show how Akers' remarks (as opposed to Akers' removal of the children from the home) had that effect; and if they are arguing that Akers' removal of the children from the home had such effect, there is no well-established constitutional right to the companionship of children whom one has abused or neglected, and thus made dependent, according to a final and appealable dependency judgment that one agreed to while represented by counsel. We conclude that the Miles lack valid claims against the State and Akers, and that the trial court did not err by dismissing those defendants.

III.
We turn to the Miles' claims against Dr. Feldman and Children's. According to the Miles, a rational trier of fact could find from this record that Dr. "Feldman negligently and recklessly diagnosed [MSBP] and made a treatment recommendation," and that Dr. "Feldman's conduct constitutes negligent and/or intentional infliction of emotional distress."[39] Dr. Feldman and Children's respond that even if he was negligent, they are immune because he acted in good faith. They also respond that the Miles cannot prove cause-in-fact because the Miles agreed to, and have not set aside, a final and appealable judgment that they abused their children.
RCW 26.44.030(1)(a) provides that "[w]hen any practitioner ... has reasonable cause to believe that a child ... has suffered abuse or neglect, he or she shall report such incident" to CPS. RCW 26.44.056(1) provides that "[a]n administrator of a hospital or similar institution or any physician ... may detain a child without consent of a person legally responsible for the child whether or not medical treatment is required, if the circumstances or conditions of the child are such that the detaining individual has reasonable cause to believe that permitting the child to continue in his or her place of residence or in the care and custody of the parent, guardian, custodian or other person legally responsible for the child's care would present an imminent danger to that child's safety," so long as the administrator or physician notifies CPS. RCW 26.44.060(2)(a) provides that "[a]n administrator of a hospital ... or any physician... taking a child into custody pursuant to RCW 26.44.056 shall not be subject to criminal or civil liability for such taking into custody," and RCW 26.44.060(1)(a) provides, subject to an exception not pertinent here, that "any person participating in good faith in the making of a [child abuse] report ... shall in so doing be immune from any liability arising out of such reporting[.]"
Assuming without holding that Dr. Feldman negligently diagnosed MSBP, he and Children's are immune from liability as a matter of law. He acted in conjunction with, and consistently with, health care professionals from Madigan (Dr. Moffitt and Knorr). He acted consistently with a physician in private practice (Dr. Ricker). He acted in conjunction with, and consistently with, all the members of Children's multidisciplinary team, including numerous doctors, nurses, and social workers. No reasonable person could find that Dr. Feldman or any of the others acted without good faith; whether mistaken or not, they believed they were acting in the best interests of the children.
Even if Dr. Feldman and Children's were not immune, the plaintiffs would *122 be unable to establish causation. To prove a negligence cause of action, a plaintiff must establish causation.[40] To do that, a plaintiff must produce evidence sufficient to support an inference that the claimed harm would not have occurred but for the claimed negligence.[41] When the Miles agreed in the dependency court that their children were dependent within the meaning of RCW 13.34.030(4), they agreed that the children were abused or neglected, and it was that abuse or neglect, not the diagnosis of MSBP, that caused the children's removal from the home. Given the evidence here, a rational trier of fact could not infer that the claimed harm (removal of the children from the home and resulting emotional distress) would not have occurred but for the claimed negligence (diagnosis and reporting of MSBP).
The Miles' claim for NIED fails for these same reasons, and also for the reasons discussed in Section II. The Miles' claim for outrage fails because no reasonable person could find that Dr. Feldman or Children's engaged in outrageous conduct.[42] The trial court did not err by dismissing the Miles' claims against Dr. Feldman and Children's.
Affirmed.[43]
SEINFELD, J., and ARMSTRONG, C.J., concur.
NOTES
[1] Clerk's Papers at 905, 910, 916.
[2] Clerk's Papers at 429; see also Clerk's Papers at 958.
[3] Clerk's Papers at 588.
[4] Clerk's Papers at 589.
[5] Clerk's Papers at 926; see also Clerk's Papers at 940, 952.
[6] Clerk's Papers at 892-93; see also Clerk's Papers at 896, 901.
[7] Clerk's Papers at 534.
[8] Clerk's Papers at 534.
[9] The shelter care hearing had originally been set for December 14. It was continued to December 16 for reasons not pertinent here.
[10] Clerk's Papers at 498.
[11] Clerk's Papers at 509-12.
[12] RCW 13.34.030(4)(b) provides that a dependent child is one "[w]ho is abused or neglected as defined in chapter 26.44 RCW by a person legally responsible for the care of the child[.]"
[13] Clerk's Papers at 2495-96.
[14] The plaintiffs are Mark and Yamila Miles, husband and wife, and Mark Miles as Guardian ad Litem for Justin Miles, Christopher Miles, and Michael Miles, minors. Clerk's Papers at 3. We refer to all of them as "the Miles."
[15] The dismissal of a claim for defamation has not been appealed and is not in issue here.
[16] Clerk's Papers at 585.
[17] Clerk's Papers at 585.
[18] Lenzi v. Redland Ins. Co., 140 Wash.2d 267, 279-80, 996 P.2d 603 (2000); United States v. Deaconess Medical Center Empire Health Service, 140 Wash.2d 104, 110, 994 P.2d 830 (2000); Thompson v. State, 138 Wash.2d 783, 790, 982 P.2d 601 (1999); Reninger v. State, 134 Wash.2d 437, 449, 951 P.2d 782 (1998); Hanson v. City of Snohomish, 121 Wash.2d 552, 561-62, 852 P.2d 295 (1993). The Miles cite Lesley v. State, 83 Wash.App. 263, 921 P.2d 1066 (1996), which is distinguishable on its facts. The Lesley court properly did not apply collateral estoppel to a shelter care order that was not final or appealable. Lesley, 83 Wash.App. at 276, 921 P.2d 1066. We properly apply collateral estoppel to a dependency judgment that was final and appealable. RAP 2.2(a)(5). The Miles also cite In re Welfare of Key, 119 Wash.2d 600, 609, 836 P.2d 200 (1992), but the discussion in that case has nothing to do with collateral estoppel.
[19] RAP 2.2(a)(5)(appeal lies from the "[t]he disposition decision following a finding of dependency"); CR 54(a)(1)("judgment ... includes any decree and order from which an appeal lies").
[20] RCW 13.34.030(4) provides that a dependent child is one "[w]ho is abused or neglected as defined in chapter 26.44 RCW by a person legally responsible for the care of the child[.]"
[21] Even if collateral estoppel were not to apply here, judicial estoppel would. Collateral estoppel promotes finality by precluding the relitigation of an issue already resolved, while judicial estoppel "prevents a party from taking a factual position that is inconsistent with his or her factual position in previous litigation." Holst v. Fireside Realty, Inc., 89 Wash.App. 245, 259, 948 P.2d 858 (1997); see also Raymond v. Ingram, 47 Wash.App. 781, 785, 737 P.2d 314 (1987), review denied, 108 Wash.2d 1031 (1987). Judicial estoppel precludes the Miles from agreeing in open court in the dependency case that their children were abused or neglected, then arguing in open court in this case that their children were not abused or neglected.
[22] Br. of Appellant at 15.
[23] Br. of Appellant at 18.
[24] Br. of Respondent at 14.
[25] Br. of Respondent at 15.
[26] RCW 26.44.030(8) provides:

(8) Any case referred to the department by a physician licensed under chapter 18.57 or 18.71 RCW on the basis of an expert medical opinion that child abuse, neglect, or sexual assault has occurred and that the child's safety will be seriously endangered if returned home, the department shall file a dependency petition unless a second licensed physician of the parents' choice believes that such expert medical opinion is incorrect. If the parents fail to designate a second physician, the department may make the selection. If a physician finds that a child has suffered abuse or neglect but that such abuse or neglect does not constitute imminent danger to the child's health or safety, and the department agrees with the physician's assessment, the child may be left in the parents' home while the department proceeds with reasonable efforts to remedy parenting deficiencies. [Italics added.]
[27] Br. of Respondent at 16.
[28] Br. of Appellant at 15.
[29] Reid v. Pierce County, 136 Wash.2d 195, 204, 961 P.2d 333 (1998); Hegel v. McMahon, 136 Wash.2d 122, 132, 960 P.2d 424 (1998). If the Miles are contending that Whaley v. State, 90 Wash.App. 658, 956 P.2d 1100 (1998) eliminated this requirement, see Appellant's Brief at 28, we think they are incorrect.
[30] See Bishop v. State, 77 Wash.App. 228, 233, 889 P.2d 959 (1995) (emotional distress is "a fact of life"); Spurrell v. Bloch, 40 Wash.App. 854, 863, 701 P.2d 529, review denied, 104 Wash.2d 1014 (1985) (emotional distress actionable only if it rises "above that level which is a fact of life;" evidence showing "one sleepless night, tears, loss of appetite, and anxiety" not sufficient); Whaley, 90 Wash.App. at 675, 956 P.2d 1100 (quoting Spurrell, 40 Wash.App. 854, 701 P.2d 529).
[31] Reid, 136 Wash.2d at 203, 961 P.2d 333.
[32] Reid, 136 Wash.2d at 202, 961 P.2d 333 (quoting Grimsby v. Samson, 85 Wash.2d 52, 59, 530 P.2d 291 (1975)).
[33] Dicomes v. State, 113 Wash.2d 612, 630, 782 P.2d 1002 (1989).
[34] Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Robinson v. City of Seattle, 119 Wash.2d 34, 66, 830 P.2d 318, cert. denied, 506 U.S. 1028, 113 S.Ct. 676, 121 L.Ed.2d 598 (1992).
[35] Robinson, 119 Wash.2d at 65-66, 830 P.2d 318.
[36] The Miles focus instead on whether Akers acted with gross negligence, recklessness or deliberate indifference. We need not reach that matter when there was no violation of a well-established constitutional right.
[37] Br. of Appellant at 36.
[38] Appellant's Reply Brief at 9.
[39] Br. of Appellant at 38-39.
[40] Hartley v. State, 103 Wash.2d 768, 777, 698 P.2d 77 (1985); Harbeson v. Parke-Davis, Inc., 98 Wash.2d 460, 468, 656 P.2d 483 (1983); Hunsley v. Giard, 87 Wash.2d 424, 434, 553 P.2d 1096 (1976).
[41] Hartley, 103 Wash.2d at 778, 698 P.2d 77; Beltran v. State, 98 Wash.App. 245, 250, 989 P.2d 604 (1999), review granted, 140 Wash.2d 1021 (2000).
[42] See Reid, 136 Wash.2d at 202, 961 P.2d 333 (conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community") (quoting Grimsby, 85 Wash.2d at 59, 530 P.2d 291) (italics deleted).
[43] On May 10, 2000, the Miles filed a motion in this court to allow the taking of additional evidence. We hereby deny that motion.