# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| RUSSELL and MEGAN CARTER, and the marital community composed thereof, and on behalf of their minor children, S.C. and E.C., | No. 58608-8-II |
| Appellants, | |
| v. | |
| MULTICARE HEALTH SYSTEM, a Washington Nonprofit Corporation; Dr. ELIZABETH WOODS and JOHN DOE WOODS and the marital community composed thereof; STATE OF WASHINGTON, a sovereign state; DEPARTMENT OF SOCIAL & HEALTH SERVICES; CHILD PROTECTIVE SERVICES, agencies of the State of Washington; NERISSA SHIRLEY & JOHN DOE SHIRLEY, wife and husband, individually and the marital community composed thereof, | PUBLISHED OPINION |
| Respondents, | |
| CITY OF TACOMA, a municipality; TACOMA POLICE DEPARTMENT, an agent of the city of Tacoma; WILLIAM MUSE & JANE DOE KELLY, husband and wife, individually and the marital community composed thereof, | |
| Defendants. | |

GLASGOW, J.—Dr. Elizabeth Woods and other Mary Bridge Children's Hospital staff

suspected that Megan Carter was intentionally harming her daughter, EC, through medical child

abuse. In 2018, Woods accused Megan[1] of medical neglect, prompting Washington's Department of Children, Youth, and Families (the Department) to file a dependency petition. As a result, the court separated Megan from her two children for 14 months. After a dependency trial, the dependency court dismissed the dependency, finding no evidence of medical abuse or neglect and concluding that Woods' accusations were unsupported. In February 2020, Woods made another report of suspected medical child abuse against Megan, this time to the King County Sheriff's Office.

In May 2021, Megan and her husband, Russel Carter, filed a lawsuit in Pierce County Superior Court against Woods and against MultiCare Health System, the parent corporation of Mary Bridge, relating to the 2018 report. The trial court dismissed the case because Woods and MultiCare had statutory immunity protecting people who have made good faith reports of suspected child abuse from liability. [2]

The Carters sought reconsideration and to amend their complaint to add claims related to the 2020 report to the sheriff's office, but the trial court denied the motion and dismissed the lawsuit entirely. The Carters did not appeal.

In November 2021, the Carters then filed another lawsuit in Thurston County Superior Court against Woods and MultiCare.[3] The Carters asserted their claims against Woods and MultiCare now stemmed from Woods' 2020 report to the King County Sheriff's Office. The Carters also amended their complaint to add claims against the Department and a caseworker for negligent investigation. MultiCare and Woods filed a motion to dismiss the claims against them,

---

[1] To avoid confusion, we refer to Megan Carter and Russell Carter by their first names.

[2] For clarity, we refer to this prior Pierce County Superior Court case as *Carter* I.

[3] For clarity, we refer to the Thurston County Superior Court case, appealed here, as *Carter* II.

which the trial court granted based on res judicata. The Department then filed a motion for summary judgment, which the trial court granted based on the statute of limitations.

On appeal, the Carters argue that the trial court erred when it applied res judicata to bar their claims against Woods and MultiCare. The Carters also argue that the trial court erred in dismissing the claims against the Department, asserting that the claim for negligent investigation is an ongoing tort, so the statute of limitations had not expired when they filed their tort claim.

We conclude that the Carters should have, with reasonable diligence, brought their claims related to the 2020 report in *Carter* I, because the Carters had sufficient information to raise these claims as early as February 2020, well before filing their initial lawsuit. Thus, we conclude that res judicata bars these claims. With regard to the claims against the Department, we decline to hold that the Carters' claim of negligent investigation is a continuing tort. As a result, the trial court properly dismissed the claims against the Department based on the statute of limitations. We affirm.

FACTS

I. BACKGROUND

The Carters have two children, SC and EC. EC was born prematurely and with health complications. Megan, EC's mother, was a former nurse and served as EC's full-time caregiver.

In March 2018, EC was hospitalized at Mary Bridge for several significant medical issues. EC remained hospitalized through May 2018. During EC's hospitalization, Woods was Mary Bridge's Medical Director of the Child Abuse Intervention Department. Mary Bridge had a policy requiring any staff member with reasonable cause to believe that a child had suffered abuse or neglect to report it immediately.

On March 30, 2018, a Mary Bridge caseworker reported to the Department concerns about Megan's ability to safely parent EC. The hospital caseworker reported that EC had been admitted for fungal sepsis, kidney infection, aspiration pneumonia, and a blood stream infection. EC had previously been hospitalized with multiple infections and failure to thrive. The caseworker reported that hospital staff members were concerned that Megan could not appropriately care for EC and they were worried about "possible intentional harm being done to [EC]." Clerk's Papers (CP) at 217. The intake noted that prior reports had mentioned a concern that Megan had Munchausen syndrome by proxy.[4] The Department screened in the referral as "Risk Only." *Id.*

At some point during EC's hospitalization at Mary Bridge, Woods received a letter from EC's maternal grandfather expressing concern over what he characterized as Megan's history of medical child abuse. Mary Bridge medical providers held two meetings to discuss EC's case, including their concerns about Megan's possible involvement in EC's illnesses. As a result, Mary Bridge placed EC in a room with video surveillance to monitor Megan and EC.

EC needed a specific dose of anticoagulant medication administered twice daily by injection to prevent blood clots. Mary Bridge staff asked Megan to help to administer the injections under nurse supervision in hopes of relieving EC's discomfort. One of EC's doctors approved this plan.

In two videos, recorded on May 4, 2018, and May 6, 2018, Mary Bridge staff reported that "Megan was seen . . . giving [EC] only a portion of the medication and emptying the syringe on the bedsheets when the [nurse] was not looking." CP at 230. On May 6, 2018, EC developed a blood clot. A nurse expressed concern that Megan's reaction to this diagnosis seemed oddly

---

[4] "A psychological disorder that induces a caregiver, usu. a parent, to fabricate or cause a child's medical problem and to seek medical treatment for the child on the basis of the fabrications or problem." BLACK'S LAW DICTIONARY 1222 (11th ed. 2019).

"'joyful'" or "'jovial.'" CP at 62, 231. Staff also reported that had EC been receiving the correct amount of medication, she would not have developed blood clots. Staff again expressed concern that Megan could have Munchausen syndrome by proxy.

After reviewing the footage and EC's medical records, Woods formed the opinion that EC was the victim of medical child abuse. Mary Bridge reported these concerns to local law enforcement and the Department. The Department took EC into protective custody and allowed Russell to remain with her at the hospital, but Megan was required to leave.

## II. DEPENDENCY PETITION AND TRIAL

On May 11, 2018, the Department filed a dependency petition alleging Megan committed medical child abuse against her children SC and EC. On May 30, 2018, the Department closed its investigation, making a founded finding for "Negligent Treatment or Maltreatment," based in part on law enforcement's report about the hospital surveillance footage. CP at 256. Specifically, the investigating detective reported seeing Megan empty the syringe of medication onto the bed sheets, shuffling the sheets and moving pillows to hide the medication. Megan was required to move away from the family home while Russell and the paternal grandparents cared for SC and EC during the dependency. Megan had regular supervised in-person visitation and frequent remote visits with her children.

Megan obtained a copy of the Mary Bridge surveillance video before the dependency trial. After Megan viewed the video, her attorney explained to the Department's attorney that when Megan administered the medication to EC in the hospital, she then pushed the plunger to retract the needle. The Department consulted a Mary Bridge nurse who responded that she did not believe the syringe Megan used had a retractable needle.

5

More than a year later, on June 21, 2019, after a lengthy dependency hearing, the dependency court entered extensive findings and conclusions. The dependency court found that the Department failed to prove by a preponderance of the evidence that Megan had medically abused her children. The court found Megan's testimony to be credible and it recited testimony from several doctors confirming that EC's medical issues were real. The court did not say that Woods and other Mary Bridge staff who reported concerns were not credible, but it explained various reasons why it found other medical professionals' testimony and Megan's testimony more reliable.

The dependency court also concluded that Mary Bridge staff misunderstood what occurred in the surveillance video of Megan administering medication to EC. In particular, the dependency court concluded that Woods and the nurses who accused Megan of wasting the anticoagulant medication failed to understand that the type of syringe Megan used required her to plunge the syringe to retract the needle after giving the injection to EC. The dependency court found that the syringe's specific functions were consistent with Megan's testimony on how she administered the medication to EC, which explained what Woods and the nurses saw on the surveillance footage. The primary doctor overseeing EC's care reviewed the videos and testified that she did not have concerns about the way in which Megan administered the medication. She also explained that many factors can cause the medication levels in a person's blood to fluctuate.

The Department also made a number of additional claims that Megan had exaggerated EC's health conditions to medical care providers which resulted in EC receiving "unnecessary medical care[,] including oxygen, medication, tests, and surgeries." CP at 67. The dependency court found that the Department had failed to provide sufficient evidence to corroborate such claims and therefore had failed to prove them by a preponderance of the evidence.

The dependency court dismissed the dependency and Megan returned home in June 2019.

III. FEBRUARY 2020 NEWS ARTICLE AND REPORT TO THE KING COUNTY SHERIFF'S OFFICE

On February 6, 2020, Woods called the King County Sheriff's Office to report concerns that Megan was medically abusing EC.[5] Woods suspected that Megan was trying to get unnecessary oxygen for EC because Megan allegedly requested oxygen for at-home use, although EC's pulmonologist made no recommendation for oxygen use and EC did not need oxygen at the time. Woods did not mention that the dependency court had recently concluded the Department failed to prove Megan had medically abused her children.

Woods also alleged that Megan had a psychiatric disorder, that EC had been subjected to years of unnecessary invasive medical procedures, and that Woods was very concerned that Megan was falsifying documentation in order to get medical equipment like oxygen for EC. Woods wrote that EC is "a victim of chronic medical child abuse," that EC is "a victim of [her mother's] mental illness," that "Megan has a psychiatric disorder which has [led] to continued falsification of medical diagnoses and needs for [EC]," and that "[e]very day that [EC] is in the care of her mother she is at risk of induced severe morbidity or death." CP 141-42. Woods advocated for EC to be admitted to Mary Bridge again for evaluation.

According to Megan, police and a child welfare worker then visited the Carters' home to investigate Woods' new report of possible medical child abuse, which was upsetting for the

---

[5] As explained in more detail below, the declaration from Megan in this record that contains these facts regarding the 2020 report to the King County Sheriff's Office is unsigned. In *Carter* II, the trial court dismissed the claims against Woods and MultiCare using a CR 12(b)(6) standard. For purposes of reviewing that CR 12(b)(6) dismissal, we can consider any hypothetical facts that the losing party asserts could be proven at trial. *FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings Inc.,* 180 Wn.2d 954, 962-63, 331 P.3d 29 (2013). Thus, we assume for purposes of this appeal that the facts stated in the unsigned declaration are true.

Carters. The police officer and child welfare worker ultimately concluded that the children seemed well cared for and took no immediate action.

Around this time, the Carters had been working with several news reporters on a series of news articles regarding their experience with MultiCare and Woods, which were published in February 2020. Shortly before publication, a reporter had reached out to Woods to get her comment on the upcoming article.

According to one article, the child welfare worker who visited the Carters in 2020 explained to the family that two members of the child abuse intervention team at Mary Bridge had submitted two new reports of child abuse. The article stated, "Although nobody at the hospital had seen or treated [EC] in more than six months, the hospital staff members were reporting—without evidence—that Carter had begun giving her daughter oxygen treatments that she does not need." CP at 168. The article also explained, "One of the referrals came from a pediatrician on the hospital's child abuse team, the Child Protective Services worker said. She would not name the doctor, but Woods is the only physician who matches that description." CP at 169. The article described allegations made in the report of a long history of child abuse. The article ended with a statement that the Carters were working with their lawyer on possibly seeking a protection order against Woods. The Carters do not contest the facts stated in the article nor do they deny they were aware of these facts in February 2020, when the series of articles was published.

The Carters believed that the report to the King County Sheriff's Office came from Woods and they believed that it was likely in retaliation for the impending news article about her. The Carters sought access to the sheriff's office reports for over a year, but the sheriff's office declined to disclose the requested records while their investigation was ongoing.

IV. PIERCE COUNTY CASE, *CARTER* I

On May 7, 2021, more than a year after the news articles were published, the Carters sued Woods and MultiCare in Pierce County Superior Court. The Carters asserted causes of action for medical malpractice, outrage, and negligent infliction of emotional distress based on their allegations that Woods made false statements about Megan and her caretaking of EC. Specifically, the complaint focused on Woods' 2018 report to the Department alleging that Megan was medically abusing her children, as well as allegations of abuse Woods made during the course of the dependency. The Carters argued that the Department relied on Woods' 2018 report to initiate dependency proceedings and separate Megan from her children, which in turn harmed the Carter family. All claims against MultiCare were based on its status as Woods' employer; there were no independent claims against MultiCare. The complaint did not mention the child abuse allegations made to the King County Sheriff's Office in February 2020.

On July 29, 2021, while their lawsuit was pending, the Carters received records from the King County Sheriff's Office containing Woods' 2020 report. The next day, on July 30, 2021, the Carters filed a motion to accept a supplemental declaration. The only copy of the declaration in our record is unsigned. *See* CP at 139. The unsigned supplemental declaration included Megan's account of the new claim Woods was making against her and its impact on her; a copy of Woods' February 2020 report to law enforcement, accusing Megan of medical child abuse; and the local news articles detailing the Carters' experience with Woods at Mary Bridge.

In the meantime, MultiCare and Woods jointly filed a motion to dismiss the lawsuit, citing statutory immunity for reporters of child abuse under RCW 26.44.060(1). This statute provides immunity from criminal and civil actions for those who make reports of child abuse in good faith. However, the statute does not provide immunity to those who have been convicted for

"intentionally and in bad faith, knowingly mak[ing] a false report of alleged abuse or neglect." RCW 26.44.060(4).

On August 4, 2021, the trial court denied the Carters' motion to accept the supplemental declaration, stating only that "[the Carters'] request to submit late materials filed 7/29/21 is denied." CP at 89. The trial court also concluded that Woods was entitled to immunity against the Carters' claims because "she has not been convicted under RCW 26.44.060(4) of making a false report." *Id.* The trial court therefore also granted Woods and MultiCare's motion to dismiss on August 4, 2021.

On August 16, 2021, the Carters sought reconsideration, and for the first time, they sought to amend their complaint to add claims regarding the 2020 report to the King County Sheriff's Office. They alleged Woods "acted intentionally and in bad faith, knowingly making a false report." CP at 103. The proposed amended complaint also included excerpts from Woods' communications to the sheriff's office.

The trial court denied both the motion to amend the complaint and the motion for reconsideration. The Carters did not appeal.

V. THURSTON COUNTY CASE, *CARTER* II

In November 2021, the Carters filed another lawsuit in Thurston County Superior Court against Woods and MultiCare, alleging medical malpractice, outrage, negligent infliction of emotional distress, and "not participat[ing] in good faith." CP at 11. The Carters again alleged harm stemming from Woods' 2018 report of medical child abuse and Megan's subsequent separation from her children, as well as the allegations Woods made in the course of the dependency proceeding. However, the Carters also added multiple allegations stemming from Woods' February 2020 report of medical child abuse to the King County Sheriff's Office. The

Carters specifically alleged that in making the February 2020 report to law enforcement, Woods was not qualified to diagnose mental illness, she did not act in good faith, and instead she "acted intentionally and in bad faith." CP at 9. The complaint also alleged that a Mary Bridge employee tweeted incorrectly that a warrant had been issued for Megan's arrest.

On November 29, 2021, the Carters filed a tort claim against the Department alleging negligent investigation resulting in a harmful placement that separated the Carter children from Megan. On February 3, 2022, the Carters filed an amended complaint adding the Department and a caseworker as defendants, alleging they committed negligent investigation, which resulted in a harmful placement when the children were separated from their mother.

MultiCare and Woods filed a joint CR 12(b)(6) motion to dismiss. The court granted MultiCare and Woods' motion and dismissed the claims against them with prejudice, holding that the Carters' claims were "barred by res judicata." CP at 191. The Department then filed a motion for summary judgment, which the trial court granted on statute of limitations grounds.

The Carters appeal.

## ANALYSIS

### I. MOTION TO DISMISS THE CLAIMS AGAINST WOODS AND MULTICARE

A.      Statutory Immunity for Good Faith Reports of Suspected Child Abuse

Health care providers must make a report if they have reasonable cause to believe that a child has been abused. RCW 26.44.030(1)(a). It is a gross misdemeanor for a mandated reporter to fail to make a report. RCW 26.44.080.

RCW 26.44.060 provides immunity from civil and criminal liability for people who make or participate in good faith reports of suspected child abuse or neglect. Specifically, the statute provides that

any person participating in good faith in the making of a report, . . . testifying as to alleged child abuse or neglect in a judicial proceeding, or otherwise providing information or assistance, including medical evaluations or consultations, in connection with a report, investigation, or legal intervention pursuant to a good faith report of child abuse or neglect shall in so doing be immune from any civil or criminal liability arising out of such reporting or testifying under any law of this state.

RCW 26.44.060(1)(a).

Anyone who "intentionally and in bad faith, knowingly makes a false report of alleged abuse or neglect shall be guilty of a misdemeanor." RCW 26.44.060(4). And anyone convicted of making a false report of child abuse shall not be immune from liability. RCW 26.44.060(1)(b).

The purpose of providing this immunity is to encourage those with good faith suspicions of child abuse to act on and report their concerns without fear of punishment. *Yuille v. State*, 111 Wn. App. 527, 534, 45 P.3d 1107 (2002). In shielding good faith reporters—even when their reports turn out to be unsupported—the statute ultimately aims to promote the protection of children. *See id.* at 534-35. Moreover, it is not bad faith for a health care provider to report suspected abuse without performing their own investigation first. *Id.* at 533.

Statutory immunity attaches when the person making the child abuse report acts with a "'reasonable good faith intent'" in light of the then-present circumstances. *Whaley v. State*, 90 Wn. App. 658, 669, 956 P.2d 1100 (1998) (quoting *Dunning v. Pacerelli*, 63 Wn. App. 232, 240, 818 P.2d 34 (1991); *Yuille*, 111 Wn. App. at 533 (noting that "[t]he report must be made in good faith to shelter the author from liability"). Even absent a criminal conviction for false reporting, where there has been a claim of liability based on an incorrect report of child abuse, dismissal would be inappropriate where there are issues of fact as to whether the report was made in good faith. *See Lesley v. Dep't of Soc. & Health Servs.*, 83 Wn. App. 263, 275-76, 921 P.2d 1066 (1996) (holding that fact issues existed as to whether a caseworker acted with reasonable good faith in a child abuse

investigation, precluding summary judgment on the parents' claim for negligent investigation of child abuse allegations); *Pacerelli*, 63 Wn. App. at 240 (holding that questions of fact existed as to the good faith of caseworkers' reports of child abuser names to the state's registry, precluding summary judgment).

In *Carter* I, the trial court dismissed the Carters' lawsuit, in relevant part, based on its application of the immunity statute to Woods' reports that she suspected Megan was subjecting EC to medical child abuse in 2018.[6] Because immunity was the relevant basis for the trial court's dismissal in *Carter* I, here we must assess whether resolution of the immunity defense in *Carter* I also resolves the application of the immunity defense in *Carter* II.[7]

Woods and MultiCare argue that *Carter* I completely resolved whether Woods, and vicariously MultiCare, are entitled to immunity for reporting child abuse allegations against the Carters. Specifically, Woods and MultiCare read RCW 26.44.060 to mean that Woods enjoys immunity absent any criminal convictions based on a finding of making a false report. Consequently, Woods and MultiCare assert that application of the statutory immunity to Woods cannot be revisited in *Carter* II. As a preliminary matter, we recognize that the plain language of the statute also requires that the report of suspected child abuse be made in good faith.

Finally, we note that the Carters included in their complaint in *Carter* II a cause of action against Woods and MultiCare for "Participating Not In Good Faith." CP at 185 (boldface omitted).

---

[6] The *Carter* I trial court also concluded that the Carters had failed to state a claim for medical malpractice, but the Carters do not allege in this appeal that their claim for medical malpractice should survive res judicata. Am. Br. of Appellants at 11 (explaining that the Carters were not appealing the dismissal of their medical malpractice claim in *Carter* II).

[7] Again, we recognize that the Carters do not appeal the dismissal of their malpractice claim, they only appeal the dismissal of their claims of outrage, negligent infliction of emotional distress, and failure to proceed in good faith, all related specifically to the February 2020 report to the King County Sheriff's Office. Am. Br. of Appellants at 11-12.

But the Carters do not explain either in their complaint or in their briefing to this court how participating in a report of child abuse "not in good faith" is a recognized cause of action in tort. Instead, it appears this portion of their complaint in *Carter* II is an attempt to abrogate the immunity defense by alleging a lack of good faith.

B.      Res Judicata

Res judicata prohibits relitigation of claims that were litigated or could have been litigated in a prior action. *Loveridge v. Fred Meyer, Inc.*, 125 Wn.2d 759, 763, 887 P.2d 898 (1995); *Pederson v. Potter*, 103 Wn. App. 62, 67, 11 P.3d 833 (2000). Courts considering res judicata must be careful not to deny a litigant their day in court. *Richert v. Tacoma Power Util.*, 179 Wn. App. 694, 704, 319 P.3d 882 (2014). However, res judicata aims to prevent piecemeal litigation and supports the finality of judgments. *Spokane Rsch. & Def. Fund v. City of Spokane*, 155 Wn.2d 89, 99, 117 P.3d 1117 (2005). The doctrine is "'designed to . . . curtail multiplicity of actions and harassment in the courts.'" *Penner v. Cent. Puget Sound Reg'l Transit Auth.*, 25 Wn. App. 2d 914, 924, 525 P.3d 1010 (alteration in original) (quoting *Bordeaux v. Ingersoll Rand Co.*, 71 Wn.2d 392, 395, 429 P.2d 207 (1967), *review denied,* 1 Wn.3d 1026, 534 P.3d 788 (2023)).

A threshold requirement for res judicata's application is "a valid and final judgment on the merits in a prior suit." *Ensley v. Pitcher*, 152 Wn. App. 891, 899, 222 P.3d 99 (2009). Res judicata bars relitigation of both a claim that was litigated to a final judgment and one that "*could have been litigated*" to a final judgment. *Id*. (emphasis added). In other words, courts can apply the doctrine to claims that were not resolved in a prior action, so long as that action resulted in a final judgment on the merits. *Richert*, 179 Wn. App. at 708. A party arguing that res judicata applies to claims that were unresolved in the prior litigation must show that "reasonably diligent parties

should have raised [the] unresolved claims in the prior litigation." *Id.* (citing *Hisle v. Todd Pac. Shipyards Corp.,* 151 Wn.2d 853, 865-66, 93 P.3d 108 (2004)).

A subsequent claim is barred under the doctrine of res judicata if the claims, taken together, are identical in "'(1) subject matter, (2) cause of action, (3) persons and parties, and (4) quality of the persons for or against whom the claim is made.'" *Mason v. Mason*, 19 Wn. App. 2d 803, 828, 497 P.3d 431 (2021) (quoting *Richert*, 179 Wn. App. at 704). Here, the Carters concede that the "persons and parties" and "quality of the persons for or against whom the claim is made" in *Carter* II are the same as those in *Carter* I. However, the Carters argue that the "subject matter" and "cause of action" differ between *Carter* I and *Carter* II.

The Carters' complaint in *Carter* II included factual allegations regarding Woods' reports of suspected child abuse in both 2018 and 2020. Now, the Carters appeal only the trial court's dismissal of allegations based on Woods' 2020 child abuse report to the sheriff's office. And the Carters do not appeal the dismissal of their malpractice claim. In other words, Woods' 2020 reports to the King County Sheriff's Office are now the heart of the Carters' remaining claims.

1.      Standard of review and available remedy

The Carters suggest that the trial court's error was its failure to expressly analyze each of the res judicata elements in its order. The Carters also suggest that the appropriate remedy is remand for the trial court to enter findings and conclusions analyzing all of the res judicata elements. We disagree.

Woods and MultiCare raised res judicata in a CR 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. This is the procedural posture in which the trial court addressed res judicata. In its oral ruling, the trial court recognized that it was typically limited to considering the pleadings and their attachments when deciding a CR 12(b)(6) motion, but the

court also took judicial notice of the uncontested documents that the parties presented from the Pierce County proceeding, *Carter* I. The trial court treated the dismissal as one made as a matter of law in its written order. It listed the filings it had considered and stated that the dismissal was based on res judicata, and it found no facts.

As a result, we review the trial court's ruling dismissing claims against Woods and MultiCare like we do all CR 12(b)(6) dismissals. We take all of the facts stated in the Carters' complaint and supporting documents as true, and we can even consider hypothetical facts supporting the plaintiffs' claims. *Future Select Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc.,* 180 Wn.2d 954, 962-63, 331 P.3d 29 (2014). Assuming all of the plaintiffs' facts (and any hypothetical facts supporting the Carters' claims) are true, we must determine as a matter of law whether the trial court erred when it concluded res judicata barred these claims. We review application of res judicata de novo. *Richert*, 179 Wn. App. at 704.

We conclude that the trial court did not fail to adequately address each element of res judicata given that the trial court was addressing a CR 12(b)(6) motion to dismiss. And we review the trial court's dismissal of the claims against Woods and MultiCare de novo, considering all facts stated in the Carters' complaint, any hypothetical facts supporting the Carters' claims, and supporting documents as true.

### 2. Reasonable diligence in *Carter* I

In *Carter* I, the Carters attempted to file a supplemental declaration from Megan and later to amend their complaint to include newly acquired facts and evidence related to Woods' February 2020 child abuse report to the sheriff's office. The trial court rejected the unsigned supplemental declaration and denied the Carters' later attempt to amend the complaint to add claims related to the 2020 report. The Carters argue that because the court rejected their additional evidence and

amended complaint, claims regarding Woods' 2020 report were never resolved in *Carter* I. Consequently, the Carters argue that the *Carter* II court erred when it dismissed these unresolved claims based on res judicata.

Because res judicata precludes unresolved claims that reasonably diligent parties should have raised in prior litigation, as an initial matter, we address whether a reasonably diligent party should have raised the claims and evidence about Woods' 2020 report in *Carter* I. *Richert*, 179 Wn. App. at 708.

There is no "simple or all-inclusive test" to determine whether a matter should have been litigated in a prior proceeding. *Kelly-Hansen v. Kelly-Hansen*, 87 Wn. App. 320, 330, 941 P.2d 1108 (1997). However, generally speaking, one cannot say that a matter should have been litigated earlier if it could not have been litigated earlier, for example, if a necessary fact was not in existence at the time. *Id.* at 330-31. Similarly, "'one cannot say that a matter should have been litigated earlier if, even though it could have been litigated earlier, there were valid reasons for not asserting it earlier.'" *In re Marriage of Dicus*, 110 Wn. App. 347, 356, 40 P.3d 1185 (2002) (quoting *Kelly-Hansen*, 87 Wn. App. at 330-31). Specifically, res judicata will not apply if the matter "'was an independent claim not required to be joined,'" or if the matter's omission from the prior proceeding benefitted, rather than vexed, the party now asserting res judicata. *Id.* (quoting *Kelly-Hansen*, 87 Wn. App. at 331). However, courts have held that a matter "'should have been raised and decided earlier'" if it was "'merely an alternate theory of recovery or an alternate remedy.'" *Id.* (quoting *Kelly-Hansen*, 87 Wn. App. at 331).

We recognize that the Carters did not receive a copy of the e-mail that Woods submitted to the King County Sheriff's Office in 2020 or the sheriff's office report about her allegations until just before the trial court's hearing on the motion to dismiss. But Megan's unsigned supplemental

declaration and the news articles attached establish that the Carters had information in February 2020 that Mary Bridge employees, probably including Woods, had made the 2020 allegations to the King County Sheriff's Office. And an article described what the Carters understood the allegations to be at that time. The Carters do not dispute the accuracy of the article's recitation of events nor do they deny that they were aware of the facts in the February 2020, when the series of articles was published.

The Carters did not act with reasonable diligence in raising the facts about Woods' February 2020 report to the sheriff's office in *Carter* I. The Carters did not include these facts or claims arising from them in their original complaint in *Carter* I, filed in May 2021, even though they knew in February 2020 about the source and general content of the child abuse report to the King County Sheriff's Office. The Carters did not move to amend their complaint to add these facts and claims based on the 2020 report. While the motion to dismiss was pending, the Carters filed a motion to include a supplemental declaration from Megan. The copy of the supplemental declaration in our record, which the Carters purported to have filed in *Carter* I, was not signed. Further, the Carters did not attempt to amend their complaint to add claims based on Woods' February 2020 report to law enforcement until *after* the *Carter* I court had orally ruled that it was dismissing the suit against Woods and MultiCare with prejudice.

However, Megan's unsigned supplemental declaration and its exhibits show that the Carters had enough information to add facts and claims relating to the 2020 child abuse report, at the very least upon information and belief sufficient to satisfy CR 11, as early as February 2020. A reasonably diligent party would have included these allegations in the May 2021 complaint or submitted an amended complaint earlier, certainly before the trial court ruled it was dismissing the case with prejudice. The Carters offer no reason for omitting this claim except that they assert they

did not have sufficient facts before the King County Sheriff's Office provided them with its records regarding the 2020 child abuse allegations. But Megan's supplemental declaration and its attachments belie this point. The Carters, had they been reasonably diligent, could and should have properly raised the allegations and claims about the 2020 child abuse report to the King County Sheriff's Office in *Carter* I, but they failed to do so.

The Carters concede that the "persons and parties" and "quality of the persons for or against whom the claim is made" in *Carter* II are the same as those in *Carter* I. The *Carter* I complaint alleged harm arising from false allegations of child abuse. Because the Carters were not reasonably diligent, and we conclude they could and should have raised the disputed facts and claims in *Carter* I, even though the claims arose from a second allegedly false allegation, the trial court was correct to dismiss based on res judicata. *See Sayward v. Thayer*, 9 Wash. 22, 24, 36 P. 966 (1894) ("[R]es judicata applies, except in special cases, not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time.") (emphasis omitted); *Schoeman v. N.Y. Life Ins. Co.*, 106 Wn.2d 855, 863, 726 P.2d 1 (1986) (affirming res judicata dismissal where plaintiff "knew or should have known" of facts giving rise to claim plaintiff failed to raise in prior litigation); *Kelly-Hansen*, 87 Wn. App. at 334 (applying res judicata where two spouses "could have, and in the exercise of reasonable diligence should have," presented facts bearing on division of property to the court in their initial dissolution action). We need not further address the disputed res judicata factors.

## II. SUMMARY JUDGMENT DISMISSAL OF CLAIMS AGAINST THE DEPARTMENT

A.  Statute of Limitations

A motion for summary judgment may be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). We review de novo the lower court's order granting summary judgment, viewing the facts and reasonable inferences in the light most favorable to the nonmoving party. *Pearson v. Dep't of Lab. & Indus.*, 164 Wn. App. 426, 431, 262 P.3d 837 (2011).

Under RCW 4.16.080, "[a]n action for taking, detaining, or injuring personal property, including an action for the specific recovery thereof, or for any other injury to the person or rights of another not hereinafter enumerated" shall be commenced within three years. RCW 4.16.080(2). The parties agree that the Carters' negligent investigation claims against the Department are subject to this three-year statute of limitations.

On May 9, 2018, the Department opened its investigation and initiated the shelter care proceeding, separating Megan from her children when local law enforcement placed EC in protective custody. On May 30, 2018, the Department closed its investigation of Megan, making a founded finding for "Negligent Treatment or Maltreatment," based in part on law enforcement's report to the Department about the hospital surveillance video. CP at 256. The Carters did not make a tort claim against the Department until November 29, 2021, more than three years later. On February 3, 2022, the Carters filed an amended complaint alleging damages for negligent investigation against the Department.

The Carters argue that the Department had a continuing duty to investigate the abuse allegations, and their failure to do so led to a continuing condition—a harmful placement decision. The Carters therefore allege that the Department's negligent investigation in this case was a

continuing tort that continued to accrue even after the Department made its finding and closed its investigation. In light of the alleged continuing tort, the Carters assert that the trial court erred when it granted the Department's motion for summary judgment on statute of limitations grounds. We decline the Carters' invitation to recognize a new continuing tort.

Washington courts recognize the theory of continuing torts in some limited circumstances when the tort causes damage to land that is ongoing but reasonably abatable. *See generally Island Lime Co. v. Seattle*, 122 Wash. 632, 211 P. 285 (1922) (nuisance); *Doran v. City of Seattle*, 24 Wash. 182, 64 P. 230 (1901) (trespass); *Fradkin v. Northshore Util. Dist.*, 96 Wn. App. 118, 977 P.2d 1265 (1999) (trespass). When a tort is continuing, the "statute of limitations runs from the date each successive cause of action accrues as manifested by actual and substantial damages." *Fradkin*, 96 Wn. App. at 125. The tort lasts until the intrusive condition is removed. *Bradley v. Am. Smelting & Refining Co.*, 104 Wn.2d 677, 693, 709 P.2d 782 (1985).

In *Fradkin*, the court explained that the continuing tort doctrine stems from reasoning that "[i]t would be inequitable . . . to estop a person from obtaining damages 'for injuries which might eventually become burdensome, because [they were] not litigious enough to plunge into a lawsuit over a trifling matter'" when the tort first arose. 96 Wn. App. at 124-25 (quoting *Doran,* 24 Wash. at 188-89). In contrast, in *Hill v. Department of Transportation,* 76 Wn. App. 631, 887 P.2d 476 (1995), a case the Carters discuss in their briefing, Division One declined to expand the continuing tort doctrine where Hill brought maritime claims based in part on ongoing symptoms he experienced as a result of his ferry working conditions. The court declined to apply the continuing tort doctrine and concluded that because Hill was aware of his condition and its cause long before the statute of limitations expired, the trial court's dismissal based on the statute of limitations was appropriate. *Id.* at 643.

A claim for negligent investigation is available to a parent or child when the Department conducts a biased or incomplete investigation that *results* in a harmful placement decision. *Petcu v. State*, 121 Wn. App. 36, 56, 86 P.3d 1234 (2004). The Carters assert that a harmful placement decision is the threshold requirement for an action for negligent investigation. In turn, the Carters argue that the court should apply the continuing tort doctrine to negligent investigations because the resulting harmful placement decision is a continuing condition for both the parent and child. If the alleged negligent investigation was a continuing tort, the Carters assert that the statute of limitations did not begin to run until the harmful placement decision ended, here when Megan returned home in June 2019. Alternatively, they assert that the Department had an ongoing duty to reopen the investigation when new facts came to light, including Megan's explanation for the appearance in the video that she was plunging the syringe onto the bedsheets. Under either reasoning, their claim for negligent investigation would be timely.

But the Carters conflate their cause of action, the alleged negligent investigation, with its resulting harm, the alleged harmful placement decision. The Carters focus on the harmful placement decision as the continuing harm to the Carter family unit, and in turn, as central to their continuing tort argument. Yet the Carters' sole tort claim against the Department is for "negligent investigation," not for "harmful placement decision." Investigations have finite start and end dates; here, those dates were undisputed, the investigation began on May 9, 2018, and ended on May 30, 2018. And although the Carters assert an ongoing duty to reopen the investigation upon presentation of facts or arguments that undermine the result, the Carters had the option of appealing the founded finding through the Department's administrative process. Challenging the founded finding and litigating the dependency were the appropriate avenues for resolving ongoing disagreement about the results of the investigation.

Moreover, we are not aware of any instance when a Washington court has ever applied the continuing tort doctrine to the tort of negligent investigation, and the Carters do not point to any Washington case where the continuing tort doctrine has been applied beyond cases involving damage to real property, including ongoing nuisance or trespass.

Applying the continuing tort doctrine to a negligent investigation tort could have far-reaching implications. To the extent that it would significantly expand potential liability, it could negatively impact children by encouraging the Department and courts to hasten the return of children to environments previously found to be abusive. We hesitate to create a precedent that would discourage the Department from advocating to keep children in shelter care out of fear that it may ultimately be wrong. We acknowledge the suffering the Carters experienced due to the trial court's placement decision. However, the legislature has shown a preference for a system that errs on the side of child safety, for example, through its adoption of immunity for good faith reporters of abuse. We decline to disrupt that balance unnecessarily.

Because the continuing tort doctrine has not been applied beyond claims regarding damages to real property and it has not been applied to negligent investigations, which have concrete end dates, the statute of limitations for the negligent investigations accrued, at the latest, on May 30, 2018 and expired three years later, on May 30, 2021. The tort claim against the Department was not filed until November 2021. Accordingly, the trial court did not err in granting the Department's motion for summary judgment on statute of limitations grounds.

The Department makes alternative arguments to support affirming the dismissal of the Carters' claims against the Department, but the court need not reach those arguments.

CONCLUSION

We affirm the trial court because res judicata bars the Carters' claims related to the 2020 report in *Carter* I and because the trial court properly dismissed the claims against the Department based on the statute of limitations.

GLASGOW, J.

We concur:

LEE, J.

VELJACIC, A.C.J.